**NORTH AMERICAN SOCCER LEAGUE: Orange County Pro Soccer; Chicago World Soccer Inc.; Caribous of Colorado, Inc.; Michigan Soccer, Limited; Houston Professional Soccer Club, Ltd.; Aztec Professional Soccer Club; Memphis Soccer Club, Inc.; Minnesota Soccer, Inc.; Lipton Professional Soccer, Inc.; Cosmos Soccer Club, Inc.; Oakland Stompers, Ltd.; Philadelphia Soccer Associates; Oregon Soccer, Inc.;**

**Blue & Gold, Ltd.; San Diego Professional Soccer Club; San Jose Earthquakes, Limited; Tampa Bay Soccer Club, Inc.; Pro Soccer, Ltd.; Tulsa Roughnecks, Ltd.; Vancouver Professional Soccer Club, Ltd.; and Washington Diplomats Soccer Club, Inc., Plaintiffs-Appellants-Cross-Appellee.**

v.

**NATIONAL FOOTBALL LEAGUE: San Francisco 49ers; Oakland Raiders; New England Patriots Football Club, Inc.; Minnesota Vikings Football Club, Inc.; The Five Smiths, Inc.; Baltimore Football, Inc.; Highwood Service, Inc.; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns, Inc.; Dallas Cowboys Football Club, Inc.; Empire Sports, Inc.; The Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston Oilers, Inc.; Los Angeles Rams Football Co.; New Orleans Saints; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Leonard H. Tose, d/b/a Philadelphia Eagles Football Club; Pittsburgh Steelers Sports; Chargers Football Company; Chicago Cardinals Football Club; Pro-Football, Inc.; and Tampa Bay Buccaneers, Inc., Defendants-Appellees-Cross-Appellant.**

Nos. 11, 30, Dockets 80–9153, 81–7003.

United States Court of Appeals,
Second Circuit.

Argued Oct. 19, 1981.

Decided Jan. 27, 1982.

Ira M. Millstein, New York City (James W. Quinn, Irwin H. Warren, Jeffrey L. Kessler, Kenneth L. Steinthal, Weil, Gotshal & Manges, New York City, of counsel), for plaintiffs-appellants-cross-appellee.

William E. Willis, New York City (James H. Carter, Howard D. Burnett, James W. Dabney, Sullivan & Cromwell, New York City, of counsel), for defendants-appellees-cross-appellant.

Before LUMBARD, MANSFIELD and VAN GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

The North American Soccer League (NASL) and certain of its member soccer teams (collectively referred to herein as "the NASL") appeal from a judgment of the Southern District of New York, Charles S. Haight, Jr., *Judge*, dissolving a preliminary injunction and dismissing a complaint seeking a permanent injunction and treble damages for alleged violations of § 1 of the Sherman Act, 15 U.S.C. § 1, by the defendants, the National Football League ("NFL") and certain of its member football clubs (collectively referred to herein as "the NFL"). The NFL cross appeals from the dismissal of its counterclaim, which sought an injunction barring owners of NASL member teams from cross-ownership of NFL teams. Because the conduct complained of by the NASL—an NFL ban on cross-ownership by NFL members of other major professional sports league teams (the "cross-ownership ban")—violates the rule of reason under § 1 of the Sherman Act, we reverse. We affirm the dismissal of the NFL's counterclaim.

The central question in this case is whether an agreement between members of one league of professional sports teams (NFL) to prohibit its members from making or retaining any capital investment in any member of another league of professional sports teams (in this case NASL) violates the antitrust laws. The answer requires an analysis of the facts and application of governing antitrust principles. Most of the

facts are not in dispute. The NFL is an unincorporated joint venture consisting of 28 individually owned separate professional football teams, each operated through a distinct corporation or partnership, which is engaged in the business of providing public entertainment in the form of competitive football games between its member teams. It is the only major league professional football association in the United States. Upon becoming a member of the NFL a team owner receives a non-assignable franchise giving him the exclusive right to operate an NFL professional football team in a designated home city and "home territory," and to play football games in that territory against other NFL members according to a schedule and terms arranged by the NFL.[1] See NFL Constitution and By-laws, §§ 3.4, 4.1, 4.2.

The success of professional football as a business depends on several factors. The ultimate goal is to attract as many people as possible to pay money to attend games between members and to induce advertisers to sponsor TV broadcasts of such games, which results in box-office receipts from sale of tickets and revenues derived from network advertising, all based on public interest in viewing games. If adequate revenues are received, a team will operate at a profit after payment of expenses, including players' salaries, stadium costs, referees, travel, maintenance and the like. Toward this goal there must be a number of separate football teams, each dispersed in a location having local public fans willing to buy tickets to games or view them on TV; a group of highly skilled players on each team who are reasonably well-matched in playing ability with those of other teams; adequate capital to support the teams' operations; uniform rules of competition governing game play; home territory stadia available for the conduct of the games; referees; and an apparatus for the negotiation and sale of network TV and radio broadcast rights and distribution of broadcast revenues among members.

To perform these functions some sort of an economic joint venture is essential. No single owner could engage in professional football for profit without at least one other competing team. Separate owners for each team are desirable in order to convince the public of the honesty of the competition. Moreover, to succeed in the marketplace by attracting fans the teams must be close in the caliber of their playing ability. As one commentator puts it

> "there is a great deal of economic interdependence among the clubs comprising a league. They jointly produce a product which no one of them is capable of producing alone. In addition, the success of the overall venture depends upon the financial stability of each club." *J. Weistart & C. Lowell, The Law of Sports* § 5.11, at 757–58 (1979).

Earlier in this century various professional football leagues existed, outstanding of which were the NFL and AFL (American Football League). In 1970 the AFL merged into the NFL, after receiving Congressional approval to avoid violation of antitrust laws that would otherwise occur.[2] Since then the NFL has assumed full responsibility for national promotion of professional football, granting of team franchises, negotiation of network TV contracts for broadcast rights with respect to its members' games, employment of referees, adoption of game rules, scheduling of season games between members leading up to the league championship game known as the Super Bowl, and many other matters pertaining to the national sport. Although specific team profit figures were not introduced at trial, the record is clear that the NFL and most of its members now generally enjoy financial success. The NFL divides pooled TV receipts

1. In a few cities the size of the population and fan interest have led the NFL to grant franchises to two teams on an equal basis in a home territory (e.g., San Francisco Forty Niners and the Oakland Raiders; the New York Giants and the New York Jets).

2. Although Congress has exempted from antitrust scrutiny the mergers of professional team sports leagues, 15 U.S.C. § 1291, it specifically provided, in adopting this exemption, that "[n]othing contained in this [exemption] shall be deemed to change, determine, or otherwise affect the applicability or nonapplicability of the antitrust laws" to such leagues, 15 U.S.C. § 1294.

equally among members. Pre-season gate receipts from each game are shared on a 50/50 basis between opposing teams, and regular season gate receipts are divided on the basis of 60% for the home team and 40% for the visiting team.

Although NFL members thus participate jointly in many of the operations conducted by it on their behalf, each member is a separately owned, discrete legal entity which does not share its expenses, capital expenditures or profits with other members. Each also derives separate revenues from certain lesser sources, which are not shared with other members, including revenues from local TV and radio, parking and concessions. A member's gate receipts from its home games varies from those of other members, depending on the size of the home city, the popularity of professional football in the area and competition for spectators offered by other entertainment, including professional soccer. As a result, profits vary from team to team. Indeed as recently as 1978, the last year for which we have records, 2 of the 28 NFL teams suffered losses. In 1977 12 teams experienced losses.[3] Thus, in spite of sharing of some revenues, the financial performance of each team, while related to that of the others, does not, because of the variables in revenues and costs as between member teams, necessarily rise or fall with that of the others. The NFL teams are separate economic entities engaged in a joint venture.

The National American Soccer League ("NASL") was founded in 1968 upon the merger of two pre-existing soccer leagues. Like the NFL, the NASL is an unincorporated association of professional soccer teams whose members are separately owned and operated, and are financially independent. Its raison d'etre and the needs of its member teams are essentially the same as those of members of other major professional sports leagues, including the NFL. However, professional soccer is not as mature or lucrative as professional football. Just as was the case with NFL member teams a quarter of a century ago,

NASL is struggling to achieve wider popularity and with it greater revenues. Consequently, the risk of investing in an NASL team is considerably greater than that of investing in the NFL.

Soccer was not a widely followed or popular sport when the NASL was founded, and several earlier attempts to put together a professional soccer league failed due to lack of fan interest. The NASL has been the most successful soccer league to date. The district court found that since the NASL was organized "professional soccer has experienced substantial and accelerated growth in fan interest, media following, paid attendance, number of franchises and geographic scope...." 505 F.Supp. 659 at 666–67. With this success NASL teams have become increasingly more effective competitors of the NFL teams. The two sports are somewhat similar. Their seasons substantially overlap. The teams have franchises from their respective leagues in the same locations and frequently use the same stadia. An increasing, although small, percentage of the public are switching their interest as fans and TV viewers from professional football to professional soccer, threatening to reduce revenue which NFL teams derive from gate receipts and TV broadcast rights. Competition between NFL and NASL teams has not only increased on an inter-league basis but also between individual NFL and NASL teams. On the league front both organizations compete for a greater share of finite national and regional TV broadcast and advertising revenues. At the local level NFL teams compete against NASL teams for greater fan support, gate attendance, and local broadcast revenues.

In spite of its success relative to other leagues that have attempted to make soccer a viable competitor, the NASL and its member teams have been, to this point, financially unsuccessful. Last year the teams collectively lost approximately $30 million. Individual NASL franchises have

---

**3.** Judge Haight did not allow discovery of actual profit figures of NFL teams. The NFL provided an index of profitability for each team that shows how the team's profits have varied over time, but gives no indication of the absolute amount of profit or the profit relative to that of other teams.

been very unstable; for example, since the trial of this case 8 of the 24 NASL teams have folded. Thus the NASL is the weakest of the major professional sports leagues (the NFL, the NASL, the National Basketball Association, the National Hockey League, and Major League Baseball).

Because of the interdependence of professional sports league members and the unique nature of their business, the market for and availability of capital investment is limited. As the district court found, the economic success of each franchise is dependent on the quality of sports competition throughout the league and the economic strength and stability of other league members. Damage to or losses by any league member can adversely affect the stability, success and operations of other members. Aside from willingness to take the risk of investing in a member of a league in which members have for the most part not demonstrated a record of profits, the potential investor must be reasonably compatible with other members of the league, with a sufficient understanding of the nature of the business and the interdependence of ownership to support not only his newly-acquired team but the sports league of which it is a member. As the district court further noted, these conditions have tended to attract individuals or businesses with distinct characteristics as distinguished from the much larger number of financiers of the type prevailing in most business markets. Although, as the district court observed, the boundaries of this "sports ownership capital and skill" market are not as confined as NASL contends and not limited strictly to present major league sports owners, the sources of sports capital are limited by the foregoing conditions and existing sports league owners constitute a significant source. In short, while capital may be fungible in other businesses, it is not fungible in the business of producing major league professional sports. Regardless of the risk involved in the venture, which may vary greatly from league to league, league members look not merely for money but for a compatible fellow owner, preferably having entrepreneurial sports skill, with whom the other members can operate their joint business enterprise. League members recognize, for example, that if the owner of one team allowed it to deteriorate to the point where it usually lost every game, attendance at games in which that team was playing would fall precipitously, hurting not just that team, but every other team that played it during the season. In view of this business interdependence team owners, through their leagues, are careful about whom they allow to purchase a team in their league and leagues invariably require that the sale of a franchise be approved by a majority of team owners rather than by the selling owner alone.

For these reasons individuals with experience in owning and operating sports teams tend to be the most sought-after potential owners. Indeed, the NFL made clear that it values proven experience in a potential owner. When in 1974 it expanded by 2 teams, 5 of the 8 prospective owners it considered seriously had professional sports team ownership experience; a sixth had experience in non-team sports. The two ownership groups to whom it awarded franchises included individuals with prior professional sports team ownership experience, and the NFL did not award the franchises to the highest bidder, a procedure that would have provided the most *immediate* financial reward to its owners.

The attractiveness of existing owners of major sports teams as sources of potential capital is further evidenced by the large number of members of major sports leagues who control or own substantial interests in members of other leagues. The record reveals some 110 instances of cross-ownership and some 238 individuals or corporations having a 10% or greater interest in other teams. Over the last 13 years there have been 16 cross-ownerships between NFL and NASL teams. Indeed, since the NASL was organized Lamar Hunt, the owner of the NFL's Kansas City Chiefs, has been involved as an NASL team owner, first of the Dallas Tornado team, then of the Tampa Bay team, and as a promoter of NASL.

Since 1975 Elizabeth Robbie, the wife of the NFL's Miami Dolphins owner Joseph Robbie, has been the majority owner of the NASL's Fort Lauderdale franchise. Mr. Robbie has apparently been the actual operator of the soccer team as well as the football team. In the words of the district court, these cross-owners have provided the NASL with an "important element of stability," 465 F.Supp. 665 at 669, which led to professional soccer's becoming a major league sport, and withdrawal of their interests "would have a significantly adverse effect on the NASL," 505 F.Supp. at 668.[4]

Beginning in the 1950's NFL commissioners had a policy against a team owner maintaining a controlling interest in a team of a competing league, which was first put in writing by the owners themselves in January 1967, at a time when 12 owners of old NFL or AFL teams (the leagues had by then agreed to merge to form the present NFL) were involved in the formation of the predecessors of the NASL. The resolution, which was approved at an owners' meeting, called for the drafting of amendments to the NFL constitution and bylaws prohibiting cross-ownership, but nothing was ever done to comply with it. In 1972 the NFL owners passed another resolution providing that NFL owners were not to acquire operating control of a team in a competing league. The participants agreed that any member holding such a controlling interest would make a "best effort" to dispose of it.

For the next five years the NFL members repeatedly passed the same resolution at meetings, except through inadvertence in 1975. During this period the NASL, which had come close to disbanding in 1968, grew more successful, due in no small part to the efforts of Hunt, who worked tirelessly to promote professional soccer and raise capital for it. NFL owners began to feel competition from the NASL. Leonard Tose, the owner of the Philadelphia Eagles, became one of the most vocal opponents of Hunt's soccer holdings. At approximately the same time the NASL Philadelphia Atoms were leading that league in attendance, and Tose's NFL football team, the Philadelphia Eagles, was losing money. (The Eagles lost money from at least 1969 to 1974, and in 1976 and 1977.) Tose became particularly incensed when Hunt began doing promotional work for the NASL. For example, at one NFL owners' meeting Tose denounced Hunt for allegedly stating in an interview that soccer is the sport of the future. Tose later explained one of the reasons for his concern, stating, "in my view when our truck drivers [fans] have X number of dollars to spend for entertainment in sport, and [sic] any dollar that they spend in another sport could affect what they spend for football." In short, Mr. Tose's business, the NFL Philadelphia Eagles, was suffering from the competition from the NASL Philadelphia Atoms.

Tose was not the only NFL owner upset by competition from a soccer league team. Max Winter, the owner of the NFL's Minnesota Vikings, became concerned about competition from the Minnesota Kicks, an NASL member. As Tose had done, Winter complained about Hunt's NASL soccer team interest at NFL owners' meetings. At his deposition he stated, "I think I said it to the league, in the room, that I object very much that an American Football Conference President [i.e., Hunt] is going to Minneapolis to advance soccer, introduce soccer in my city." Winter discussed Hunt's activities with Tose, stating that he felt that the Kicks "are hurting us, the sports dollar, that they are drawing very well, that we are losing ground as far as media exposure, fan participation. [It g]enerally hurts us."

Finally in 1978 the NFL owners moved to take strong action against Hunt and Robbie. An amendment to the NFL by-laws was proposed that would require both to divest their soccer holdings if they wished to continue to own an NFL team. The

---

4. In addition to the Hunt and Robbie cross-ownerships Bill Bidwill had a controlling interest in the NFL St. Louis Cardinals and a 3% interest in the NASL California Surf. Earlier cross-ownership by beneficial owners of the NFL Seattle Seahawks of interests in the NASL Seattle Sounders was terminated.

proposed amendment, which was to have been voted on at an October 1978 NFL owners' meeting, would also have prevented all majority owners, certain minority owners, officers and directors of NFL teams, and certain relatives of such persons from owning any interest in a team in a "major team sport." The proposal was to amend Article IX of the NFL Constitution and By-laws by adding a new Section 9.4 as follows:

"9.4(A) No person (1) owning a majority interest in a member club, or (2) directly or indirectly having substantial operating control, or substantial influence over the operations, of a member club, or (3) serving as an officer or director of a member club, nor (4) any spouse or minor child of any such person, may directly or indirectly acquire, retain, or possess any interest in another major team sport (including major league baseball, basketball, hockey and soccer).

"(B) The prohibition set forth in subsection (A) hereof shall also apply to relatives of such persons (including siblings, parents, adult children, adult and minor grand children, nephews and nieces, and relatives by marriage) (1) if such person directly or indirectly provided or contributed all or any part of the funds used to purchase or operate the other sports league entity, or (2) if there exists between such person and any such relative a significant community of interest in the successful operation of the other sports league entity.

"(C) The Commissioner shall investigate, to the extent he deems necessary or appropriate, any reported or apparent violation of this Section and shall report his findings to the Executive Committee prior to imposition of disciplinary action by the Committee.

"(D) Beginning on February 1, 1980, any person who, after notice and hearing by the Executive Committee, is found to have violated subsection (A) or (B) above will be subject to fines of up to $25,000 per month for each of the first three months of violations; up to $50,000 per month for each of the next three months;

and up to $75,000 per month thereafter. In addition, violations of more than six months' duration may be dealt with by the Executive Committee pursuant to Article VIII, Section 8.13(B).

"(E) If such person does not pay such fine to the League Treasurer within 20 days of its assessment, the unpaid amount thereof may be withheld, in whole or in part, by the Commissioner from available funds in possession of the League Office belonging to the member club with which the person in violation is affiliated."

As the district court found, the cross-ownership ban "has a concededly anticompetitive intent and, in its impact on the NASL, will probably have an anticompetitive effect." 505 F.Supp. at 689. The purpose of the ban was to weaken the NASL and its member teams so that they could not compete as effectively against the stronger, more mature, and lucrative NFL teams as they might be able to do with the aid of capital investment by NFL team owners.

On September 28, 1978, the NASL and various of its members commenced this action by serving the NFL with a complaint and an order to show cause why it should not be preliminarily enjoined from adopting the proposed amendment. On February 21, 1979, after hearing oral argument, Judge Haight issued a preliminary injunction prohibiting the enactment of the amendment. The judge found that the NASL would be irreparably injured if the NFL were allowed to adopt the amendment, that there were serious questions going to the merits, and that the balance of the hardships tipped in favor of the NASL. 465 F.Supp. 665. The NFL did not appeal the injunction.

A lengthy trial followed, and on November 17, 1980, Judge Haight issued his decision. 505 F.Supp. 659. Although he found that the purpose and impact of the NFL cross-ownership ban was to suppress competition in interstate commerce on the part of NASL and its members, he denied relief on the ground that in competing against NASL and its members the NFL and its members must be regarded as a "single

economic entity," rendering § 1 of the Sherman Act inapplicable for the reason that it is limited to a plurality of actors. Recognizing that individual NFL teams compete with individual NASL teams for the consumer's dollar in their respective localities, the district court nevertheless concluded that this NFL team-member versus NASL team-member competition is subsumed in league versus league competition in the general entertainment market, which he described as "the primary economic competition in professional sports," 505 F.Supp. at 678, stating that in all relevant markets the competition is "between two single economic entities uncomplicated by any relevant competition between the member clubs of a league," *id.* at 685. Decisions rejecting sports leagues' contentions that they should be treated as "single economic entities" were distinguished on the ground that they involved different types of markets in which the members of a sports league were competing individually against each other (e.g., for players' services, hiring availability and terms, reserve clauses, college drafts, etc.), whereas here the court considered them to act monolithically as one joint enterprise. Supreme Court decisions in non-sports antitrust cases rejecting arguments that business trade restraints were justified on the ground that two or more participants had acted as a joint venture or "single business entity," e.g., *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), and *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), were distinguished on the ground those combinations, unlike sports leagues, were unnecessary to the successful production and marketing of the product involved, the district judge here stating, "No interdependence or joint action is necessary to make a bearing or a muffler." 505 F.Supp. at 686. Because individual teams acting alone could not produce "Pro Football," Judge Haight reasoned, the combination of those teams through the NFL was justified by its "dominant purpose," the production of the league sport, and was legal under *Timken* and *Perma*

*Life.* For the same reason the judge refused to apply the rule of reason as articulated in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Judge Haight further concluded that, while a sports ownership capital market may exist as a submarket of the broad capital funds market, the NASL and its members had failed to prove that the submarket was, as claimed by them, limited to present owners of major sports league teams. He declined to make any finding as to the scope of the submarket and whether the NFL cross-ownership ban foreclosed NASL teams from access to any significant share of it or restrained them from competing against NFL teams in the entertainment market. Instead he chose to rest his decision on the "single economic entity" theory.

NFL's two counterclaims were both rejected as without substance. With respect to the first counterclaim, which sought an injunction prohibiting the NASL and its member teams from engaging in cross-ownership with the NFL on the ground that such activity was analogous to interlocking directorates linking horizontal competitors, the judge ruled that the NFL had not shown any threat of injury from the alleged violation and, assuming that it had proved a threat of injury, an injunction would be mere surplusage because the NFL had the power to end cross-ownership itself.

## DISCUSSION

The first issue is whether § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations . . ." applies to the cross-ownership ban adopted by NFL and its members. The NFL contends, and the district court held, that § 1 does not apply for the reason that the NFL acted as a "single economic entity" and not as a combination or conspiracy within the meaning of that law. We disagree. As the Supreme Court long ago recognized, the

Sherman Act by its terms applies to *"every"* combination or agreement concerning trade, not just certain types. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). The theory that a combination of actors can gain exemption from § 1 of the Sherman Act by acting as a "joint venture" has repeatedly been rejected by the Supreme Court and the Sherman Act has been held applicable to professional sports teams by numerous lesser federal courts. See, e.g., *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–86, 20 L.Ed.2d 98 (1968); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951); *Radovich v. National Football League,* 352 U.S. 445, 449–52, 77 S.Ct. 390, 392–94, 1 L.Ed.2d 456 (1957); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Linseman v. World Hockey Association,* 439 F.Supp. 1315 (D.Conn.1977); *Robertson v. National Basketball Association,* 389 F.Supp. 867 (S.D.N.Y.1975); *Philadelphia World Hockey Club Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462 (E.D.Pa.1972); *Smith v. Pro-Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1978); *Mackey v. NFL,* 543 F.2d 606 (8th Cir. 1976), *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); *Los Angeles Memorial Coliseum Commission v. NFL, ("Coliseum II "),* 484 F.Supp. 1274 (C.D.Cal.), *rev'd on other grounds,* 634 F.2d 1197 (9th Cir. 1980); *Los Angeles Memorial Coliseum v. NFL,("Coliseum I "),* 468 F.Supp. 154, 164 (C.D.Cal.1979); *Bowman v. NFL,* 402 F.Supp. 754 (D.Minn.1975); *Kapp v. NFL,* 390 F.Supp. 73 (N.D.Cal.1974), *appeal vacated,* 586 F.2d 644 (9th Cir. 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). Cf. *San Francisco Seals Ltd. v. National Hockey League,* 379 F.Supp. 966 (C.D.Cal.1974); *Levin v. National Basketball Association,* 385 F.Supp. 149 (S.D.N.Y. 1974). We are unpersuaded by the efforts of the district judge to distinguish these cases from the present one. Although many involved player relations or playing sites, which affect competition between member teams, at least one raised issues between leagues. In *Radovich v. National Football League, supra,* the issue was whether an NFL boycott of a player who had previously accepted employment with a competing pro-football league, the All America Conference, violated § 1 of the Sherman Act. The Court held in *Radovich* that it did, even though that boycott might not, in the words of the district court, "implicate [or] impinge[ ] upon competition between member clubs." 505 F.Supp. at 677.

The characterization of NFL as a single economic entity does not exempt from the Sherman Act an agreement between its members to restrain competition. To tolerate such a loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects. Moreover, the restraint might be one adopted more for the protection of individual league members from competition than to help the league. For instance, the cross-ownership ban in the present case is not aimed merely at protecting the NFL as a league or "single economic entity" from competition from the NASL as a league. Its objective also is to shield certain individual NFL member teams as discrete economic entities from competition in their respective home territories on the part of individual NASL teams that are gaining economic strength in those localities, threatening the revenues of such individual teams as the NFL Philadelphia Eagles, owned by Leonard Tose, because of competition by the NASL's Philadelphia team, and the revenues of the NFL Minnesota Vikings because of competition by the successful NASL Minnesota Kicks. The NFL members have combined to protect and restrain not only leagues but individual teams. The sound and more just procedure is to judge the legality of such restraints according to well-recognized standards of our antitrust laws rather than permit their exemption on the ground that since they in some measure

strengthen the league competitively as a "single economic entity," the combination's anticompetitive effects must be disregarded.[5]

Having concluded that § 1 of the Sherman Act is applicable, we next must decide whether the NFL teams' cross-ownership ban violates that statute. The plaintiffs, characterizing the ban as a "group boycott" and "concerted refusal to deal," contend that the conduct is a species of the patently pernicious anticompetitive kind that must be condemned as *per se* unlawful without further proof. See, e.g., *United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (agreements between horizontal competitors to maintain price of their product); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (allocation of market territories between horizontal competitors); *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (conspiracy between manufacturers and distributors to eliminate price competition by discounters); *Klor's, Inc. v. Broadway-Hale Store, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (agreement between 10 competing national manufacturers and their distributors not to sell products to petitioner or to sell only at discriminatory prices and unfavorable terms); *United States v. Koppers Company, Inc.*, 652 F.2d 290 (2d Cir. 1981) (agreement between competitors to rig bids and allocate market territories). We disagree.

Combinations or agreements are *per se* violations of the Sherman Act only if they are so "plainly anticompetitive," *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978), and so lacking in any "redeeming virtue," *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958),

that "because of [their] unquestionably anticompetitive effects," *United States v. United States Gypsum Co.*, 438 U.S. 422, 440, 98 S.Ct. 2864, 2875, 57 L.Ed.2d 854 (1978), "they are conclusively presumed illegal without further examination under the rule of reason generally applied in Sherman Act cases," *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). Examples are agreements between competitors fixing prices at which they will sell their competing products, limiting their respective marketing areas, or restricting customers to whom their products will be sold or from whom they will be purchased. The cross-ownership ban, though anticompetitive, does not meet these stringent conditions. Although competition exists between NFL members in various respects (e.g., on the playing fields, for players' services and for fans within a home territory where two or more teams are franchised), that competition is not restrained by the cross-ownership ban. Indeed, it is irrelevant to that ban, which is designed to restrain competition by NASL teams *against* NFL teams, *not* competition *between* NFL teams. Bearing in mind the Supreme Court's admonition in *Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977), that "[p]er se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive," we are not prepared, by using "the tyranny of tags and tickets," Cardozo, *Mr. Justice Holmes*, 44 Harv.L.Rev. 682, 688 (1931), to label league cross-ownership bans automatically unlawful regardless of their effects. As the arguments advanced by the NFL indicate, circumstances could exist that might justify a ban by a weak league as necessary to protect it against serious competitive harm by a cross-owner who threatened to misuse his position in that league to favor a stronger competing league and its

---

5. Even if the NFL were a single firm, that fact would not immunize from § 1 scrutiny the restraint involved here. Vertical agreements between a corporation and its distributors are subject to the rule of reason, *Continental TV, Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and we see no reason why an agreement between a corporation and its owners (as the NFL teams owners would be under this assumption) should be treated differently.

members. Under those circumstances a ban "might survive scrutiny under the Rule of Reason even though [it] would be viewed as a violation of the Sherman Act in another context," *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 686, 98 S.Ct. at 1362.

■ Because agreements between members of a joint venture can under some circumstances have legitimate purposes as well as anticompetitive effects, they are subject to scrutiny under the rules of reason. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *United States v. Addyston Pipe & Steel Co.,* 85 Fed. 271 (6th Cir. 1898). This entails an inquiry into "whether the challenged agreement is one that promotes competition or one that suppresses competition," *National Society of Professional Engineers v. United States, supra,* 435 U.S. at 691, 98 S.Ct. at 1365, that is, whether the procompetitive effects of this restraint outweigh the anticompetitive effects. As we stated in *Eiberger v. Sony Corp. of America,* 622 F.2d 1068, 1076 (2d Cir. 1980) (quoting *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)),

> "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its conditions before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

Finally, in carrying out a rule of reason analysis, "the existence of [less restrictive] alternatives is obviously of vital concern in evaluating putatively anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 303 (2d Cir. 1979).

■ In this case, the procompetitive effect claimed by the defendants for the cross-ownership ban is that the ban is necessary for the NFL owners to compete efficiently in the professional sports league market. On the other hand, the voluminous trial record discloses that the NFL's cross-ownership ban would foreclose NASL's teams from continued enjoyment of and access to a significant segment of the market supply of sports capital and skill, thereby restraining at least some NASL teams from competing effectively against NFL teams for fan support and TV revenues. Any resulting restraint would benefit not merely the NFL as a league but those NFL teams that would be otherwise weakened individually and disproportionally (as compared with other NFL teams) by competing NASL teams. This evidence of the defendants' anticompetitive purpose is relevant in judging its potential anticompetitive effect. *Eiberger v. Sony Corp. of America,* 622 F.2d 1068, 1076 (2d Cir. 1980) quoting *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918)). *Accord, National Society of Professional Engineers v. United States,* 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

NFL argues that there is no such thing as a limited market or submarket for sports capital and skill, only a general market in which "capital is fungible." It further urges that in this much larger market the effect of the cross-ownership ban would be *de minimis,* working no appreciable anticompetitive restraint on NASL teams, and that their difficulty in attracting capital is attributable to the poor financial outlook of their franchises rather than to the ban.[6] Judge Haight, while noting the weakness of the NASL teams' financial condition and

---

6. The NFL claims that no special skills are required to run a major league sports team.

prospects, made no definite finding regarding the existence or scope of a sports capital market other than to state that it was not, as NASL contended, limited to existing or potential major sports team owners, a finding with which we need not disagree. Simultaneously he rejected the NFL's contention as to the scope of the relevant capital market, stating,

> "I reject the extremes of both the Guth [NASL] and Caputo [NFL] perceptions. Individuals and corporations alike have identifiable characteristics which incline them toward sports ownership. Findings Nos. 17–18. The absence of such characteristics, in an individual or corporation, effectively removes them from the *sports* capital market, thereby shrinking the worldwide boundaries envisioned by Caputo. But there is no basis, in logic or law, for restricting the boundaries of that submarket, as would Guth, to individuals who are presently controlling owners of a major league team. That narrow perception disregards significant, interchangeable sources of sports capital: individuals who are not presently controlling sports owners; and corporations." 505 F.Supp. at 682.

Since NASL had failed to prove its concept of a narrow sports capital market, the district court declined to make more specific findings other than to indicate that a sports capital market does exist, which is not as small as urged by NASL nor as large as contended by NFL. He concluded that it was unnecessary for him to define the scope of the sports capital market because "if competition does exist in such a submarket, it is, again, competition between two single economic entities," 505 F.Supp. at 684.

Since we have rejected the "single economic theory" in the context of this case, it is necessary to determine whether the record discloses a separate market for sports capital and skill. We are satisfied that it does. As the Supreme Court noted in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962):

> The boundaries of . . . a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."

Because of the economic interdependence of major league team owners and the requirement that any sale be approved by a majority of the league members, an owner may in practice sell his franchise only to a relatively narrow group of eligible purchasers, not to any financier.[7] The potential investor must measure up to a profile having certain characteristics. Moreover, on the supply side of the sports capital market the number of investors willing to purchase an interest in a franchise is sharply limited by the high risk, the need for active involvement in management, the significant exposure to publicity that may turn out to be negative, and the dependence on the drawing power and financial success of the other members of the league. The record thus reveals a market which, while not limited to existing or potential major sports team owners, is relatively limited in scope and is only a small fraction of the total capital funds market. The evidence further reveals that in this sports capital and skill market owners of major professional sports teams constitute a significant portion. Indeed the existence of such a submarket and the importance of the function of existing team owners as sources of capital in that market are implicitly recognized by the defendants' proven intent in adopting the cross-ownership ban. If they believed, as

---

7. For example, Steve Rosenbloom, the son of the former owner of the NFL's Baltimore Colts, said of the family's experience in attempting to sell the Colts:

> "As I say from experience, it is a small market, because it was no secret we might have sold the thing and that we were talking to people. A few people came around, and those that came around never came up with any concrete proposal. I would take that experience and say, theoretically or practically, or realistically, there didn't seem to be a large market for it."

NFL now argues, that all sources of capital were fungible substitutes for investment in NASL sports teams and that the ban would not significantly foreclose the supply of sports capital, they would hardly have gone to the trouble of adopting it. Unless the ban has procompetitive effects outweighing its clear restraint on competition, therefore, it is prohibited by § 1 of the Sherman Act. That law does not require proof of the precise boundaries of the sports capital market or the exact percentage foreclosed; it is sufficient to establish, as was done here, the general outlines of a separate submarket of the capital market and that the foreclosed portion of it was likely to be significant.

NFL argues that the anticompetitive effects of the ban would be outweighed by various procompetitive effects. First it contends that the ban assures it of the undivided loyalty of its team owners in competing effectively against the NASL in the sale of tickets and broadcasting rights, and that cross-ownership might lead NFL cross-owners to soften their demands in favor of their NASL team interests. We do not question the importance of obtaining the loyalty of partners in promoting a common business venture, even if this may have some anticompetitive effect. But in the undisputed circumstances here the enormous financial success of the NFL league despite long-existing cross-ownership by some members of NASL teams demonstrates that there is no market necessity or threat of disloyalty by cross-owners which would justify the ban. Moreover, the NFL was required to come forward with proof that any legitimate purposes could not be achieved through less restrictive means. This it has failed to do. The NFL, for instance, has shown no reason why it could not remedy any conflict of interest arising out of NFL–NASL competition for broadcast rights by removing cross-owners from its broadcast rights negotiating committee.

For the same reasons we reject NFL's argument that the ban is necessary to prevent disclosure by NFL cross-owners of confidential information to NASL competitors. No evidence of the type of information characterized as "confidential" is supplied. Nor is there any showing that the NFL could not be protected against unauthorized disclosure by less restrictive means. Indeed, despite the existence of NFL cross-owners for some years there is no evidence that they have abused confidentiality or that the NFL has found it necessary to adopt confidentiality rules or sanctions. Similarly, there is no evidence that cross-ownership has subjected the personnel and resources of NFL cross-owners to conflicting or excessive demands. On the contrary, successful NFL team owners have been involved in ownership and operation of other outside businesses despite their equal potential for demands on the owners' time and resources. Moreover, a ban on cross-ownership would not insure that NFL team owners would devote any greater level of their resources to team operations than they otherwise would.

Although there may be some merit in NFL's contentions that the ban would prevent dilution of the good will it has developed, that it would avoid any disruption of NFL operations because of disputes between its owners or cross-owners, or that it would prevent possible inter-league collusion in violation of the antitrust laws, these procompetitive effects are not substantial and are clearly outweighed by its anticompetitive purpose and effect. Its net effect is substantially to restrain competition, not merely competitors. It therefore violates the rule of reason. See *McClain v. Real Estate Board*, 444 U.S. 232, 243, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 129 n.4, 132 n.6 (2d Cir.) *(en banc), cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

■ In view of our holding with respect to plaintiffs' claims against NFL, the latter's counterclaim deserves little comment. It amounts to little more than a meritless makeweight. The claim that cross-ownership violates § 1 of the Sherman Act because it is analogous to an interlocking directorate of the type prohibited by § 8 of the Clayton Act, 15 U.S.C. § 19, is wholly

unsupported in fact and in law. Absent proof that the leagues are corporate or separate entities with directors, which they are not, § 8 has no application. Moreover, in the absence of evidence that cross-ownership restrains or threatens competition between the two leagues or their member teams, the mere common ownership of some teams and membership of some owners on league committees do not constitute a violation of the antitrust laws. On the contrary, there is evidence of record that cross-ownership, by strengthening some NASL teams, has increased their competition against NFL teams. In any event, as the district court observed, NFL has not offered any evidence that it has suffered or faces a significant threat of injury by reason of cross-ownership, which is essential to the issuance of the injunctive relief requested.

We reverse the order granting judgment of the NFL and remand with directions to enter a permanent injunction prohibiting the ban. Because the district court's decision made it unnecessary for it to consider the issue of damages, we remand for consideration of that issue. We affirm the dismissal of NFL's counterclaim requesting an injunction against cross-ownership.