Freeman McNEIL, Mark Collins, Lee Rouson, Niko Noga, Don Majkowski, Dave Richards, Tim McDonald, and Frank Minnifield, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, The Five Smiths, Inc., d/b/a Atlanta Falcons; Buffalo Bills, Inc., d/b/a Buffalo Bills; Chicago Bears Football Club, Inc., d/b/a Chicago Bears; Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals; Cleveland Browns, Inc., d/b/a Cleveland Browns; The Dallas Cowboys Football Club, Ltd., d/b/a Dallas Cowboys; PDB Sports, Ltd., d/b/a Denver Broncos; The Detroit Lions, Inc., d/b/a Detroit Lions; The Green Bay Packers, Inc., d/b/a Green Bay

---

Packers; Houston Oilers, Inc., d/b/a Houston Oilers; Indianapolis Colts, Inc., d/b/a Indianapolis Colts; Kansas City Chiefs Football Club, Inc., d/b/a Kansas City Chiefs; The Los Angeles Raiders, Ltd., d/b/a Los Angeles Raiders; Los Angeles Rams Football Company, Inc., d/b/a Los Angeles Rams; Miami Dolphins, Ltd., d/b/a Miami Dolphins; Minnesota Vikings Football Club, Inc., d/b/a Minnesota Vikings; KMS Patriots Limited Partnership, d/b/a New England Patriots; The New Orleans Saints Limited Partnership, d/b/a New Orleans Saints; New York Football Giants, Inc., d/b/a New York Giants; New York Jets Football Club, Inc., d/b/a New York Jets; The Philadelphia Eagles Football Club, Inc., d/b/a Philadelphia Eagles; B & B Holdings, Inc., d/b/a Phoenix Cardinals; Pittsburgh Steelers Sports, Inc., d/b/a Pittsburgh Steelers; The Chargers Football Company, d/b/a San Diego Chargers; The San Francisco Forty–Niners, Ltd., d/b/a San Francisco 49ers; The Seattle Professional Football Club, Ltd., d/b/a Seattle Seahawks; Tampa Bay Area NFL Football Club, Inc., d/b/a Tampa Bay Buccaneers; Pro–Football, Inc., d/b/a Washington Redskins; Defendants.

Civ. No. 4–90–476.

United States District Court,
D. Minnesota,
Fourth Division.

April 15, 1992.

Edward M. Glennon, Carol T. Rieger, Luke H. Terhaar; Charles J. Lloyd, Lindquist & Vennum, Minneapolis, Minn., James W. Quinn, Jeffrey L. Kessler, Craig Allely, Daniel Rubin, Evie C. Goldstein, Jay L. Levine, Holly J. Gregory, Jonathan T. Weiss, Weil, Gotshal & Manges, New York City, for plaintiffs.

James Fitzmaurice, Patrick J. Schiltz, Faegre & Benson, Minneapolis, Minn., Herbert Dym, Jeffrey Pash, Neil K. Roman, Covington & Burling, Washington, D.C., Frank Rothman, Shepard Goldfein, Douglas B. Adler, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendants.

## ORDER

DOTY, District Judge.

This matter is before the court on the following motions:

1. Defendants' motion for summary judgment on Count II of the amended complaint;

2. Defendants' motion for summary judgment on Count I and II of the amended complaint;

3. Defendants' motion for partial summary judgment on plaintiffs' damage claims;

4. Plaintiffs' motion for partial summary judgment on Count I of the amended complaint;

5. Plaintiffs' motion for partial summary judgment on Count II of the amended complaint; and

6. Plaintiffs' motion for partial summary judgment concerning defendants' monopoly power in relevant markets.

Based on a review of the file, record and proceedings herein, the court:

1. Denies defendants' motion for summary judgment on Count II of the amended complaint;

2. Denies defendants' motion for summary judgment on Count I and Count II of the amended complaint;

3. Denies defendants' motion for partial summary judgment on plaintiffs' damage claims;

4. Denies plaintiffs' motion for partial summary judgment on Count I of the amended complaint;

5. Denies plaintiffs' motion for partial summary judgment on Count II of their amended complaint; and

6. Grants in part and denies in part plaintiffs' motion for partial summary judgment concerning defendants' monopoly power in relevant markets.

## BACKGROUND

Plaintiffs, eight individual football players whose contracts with their NFL employers expired on February 1, 1990, assert various claims arising from defendants' alleged violation of § 1 of the Sherman Act. Plaintiffs and defendants bring motions on various issues. This order will set forth the facts and law relevant to each motion in turn.[1]

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which requires that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Stated in the negative, summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); Fed. R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. With this standard at hand, the court will consider the various motions.

1. *The Parties' Motions on Count II of Plaintiffs' Complaint*

Both plaintiffs and defendants move for summary judgment on plaintiffs' claim concerning a proposed wage scale. On November 16, 1988, defendants presented to the National Football League Players Association ("NFLPA")[2] a proposal to enter a new system of player restraints entitled

---

1. For purposes of analysis, the court combined plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment on Count II of the amended complaint.

2. The NFLPA is not a party to the present lawsuit. In its order dated May 23, 1991, the court determined in the present case that the NFLPA no longer represents the football players as a collective bargaining representative. *Powell v. National Football League*, 764 F.Supp. 1351, 1358–59 (D.Minn.1991) (holding only in *McNeil*).

"Plan B." Under one provision of that plan, defendants proposed to eliminate all individual contract negotiations with players as of February 1, 1993 and to establish a wage scale setting the price for all NFL players' services.[3] In Count II of their amended complaint, plaintiffs allege that the proposed Plan B wage scale is an agreement among competitors, the NFL member clubs, to fix the prices to be paid for plaintiffs' services as professional football players and as such constitutes a per se violation of § 1 of the Sherman Act, 15 U.S.C. § 1 (1988). Plaintiffs thus seek an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26 (1988), to permanently bar the NFL defendants from implementing any such wage scale.

Plaintiffs move for partial summary judgment on that claim, contending that such a wage scale would clearly constitute a per se antitrust violation as a horizontal price-fixing agreement. They further contend that even if the proposed wage scale were not illegal per se, that the absence of any plausible procompetitive justification for its implementation renders it an unreasonable restraint of trade as a matter of law. They finally assert that the Plan B wage scale poses a significant threat of antitrust injury to plaintiffs and ask the court to grant partial summary judgment and permanently enjoin the NFL defendants from entering into or implementing any agreement to fix the prices to be paid for the services of plaintiffs at any time in the future.

Defendants argue, however, that the court should not enjoin a system that is neither planned nor in place. They further contend that any proposed wage scale should be evaluated under the rule of reason and proffer what they characterize as a judicially recognized procompetitive justification for such a wage scale, that is the promotion of competitive balance among NFL member clubs. They argue that their proffered justification creates a material fact dispute that defeats plaintiffs' motion for partial summary judgment on the unreasonableness of such a wage scale.

Defendants also move for summary judgment on Count II of the amended complaint, arguing that any proposed implementation of a wage scale is too speculative to support a permanent injunction. They further contend that plaintiffs are unable to establish any cognizable antitrust injury and thus have no standing to challenge the future implementation of a wage scale.

Count II of plaintiffs' amended complaint seeks an "injunction against [a] League-wide wage scale to be imposed by Plan B." Section 16 of the Clayton Act expressly authorizes injunctive relief in private litigation:

"against threatened loss or damage by a violation of the antitrust laws, ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity."

15 U.S.C. § 26 (1988). The Supreme Court has held that such injunctive relief:

Is characteristically available even though the plaintiff has not yet suffered actual injury; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws....

*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969) (citations omitted). Plaintiffs argue that the proposed wage scale constitutes such a threat. In 1989, the NFL defendants unilaterally imposed Plan B[4] and have subsequently executed many of its provisions, including the right of first refusal and compensation restrictions, the elimination of severance benefits, the discontinuation of the NFL player retirement plan and the freezing of pension and disability benefits at 1982 contract levels. Plaintiffs thus argue that the other major component of Plan B, the proposed

---

**3.** The NFL defendants specifically proposed to "eliminate all ... individual player bargaining and ... establish a League-wide wage scale."

**4.** On February 1, 1989, the NFL defendants implemented Plan B without the approval of either the players or the NFLPA.

wage scale, presents a threat sufficient to justify an injunction.

Although originally proposed in 1988 as part of Plan B, defendants contend that the wage scale was not included in Plan B as implemented in 1989. They also claim that they have taken no further steps to develop or implement that wage scale and proffer a declaration of NFL Commissioner Paul Tagliabue in which he states that the league:

> Will not implement unilaterally a League-wide wage scale in 1993 and has no plans to do so at any other time.

(Tagliabue Decl. ¶ 3). Defendants also proffer testimony by operating officers of several NFL member clubs indicating that at the present time no steps have been taken to implement any wage scale. Defendants further argue that the absence of any wage scale for the 1993 season is confirmed by the fact that all of the NFL clubs have signed player contracts that extend until 1993 season and beyond.[5] Defendants finally assert that they will stipulate to the substance of Commissioner Tagliabue's declaration and to the dismissal, without prejudice, of Count II of the amended complaint, thus permitting either the present plaintiffs or other players to seek future relief if defendants actually implement a wage scale.

■ To obtain a permanent injunction under § 16 of the Clayton Act, 29 U.S.C. § 26, the Supreme Court has determined that an antitrust plaintiff must show that defendant's actual or threatened conduct: (1) will violate the antitrust laws, (2) proximately causes, or if implemented would cause, a loss or injury, (3) is of the type the antitrust laws were designed to prevent and (4) is cognizable in equity. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110–12, 107 S.Ct. 484, 489–90, 93 L.Ed.2d 427 (1986); *accord Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n,* 666 F.2d 1130, 1147 (8th Cir. 1981). Applying that standard to plaintiffs' wage scale claim, the court concludes that plaintiffs fail to demonstrate a "signif-

icant threat of injury from an impending violation of the antitrust laws." *Zenith Radio,* 395 U.S. at 130, 89 S.Ct. at 1580. As defendants concede:

> [t]his court's refusal to enter a permanent injunction against a League-wide wage scale here would not preclude a challenge should the League implement such a system—or take concrete steps to do so—at a later time.

(Defendants' Memorandum in Support of their Motion for Summary Judgment at 10 n. 9 (Nov. 15, 1991)). Reviewing the record, the court determines that it is not clear that defendants will attempt to impose a wage scale in 1993 and if such a scale would directly injure plaintiffs, and thus concludes that the threat of antitrust injury is too speculative to justify a permanent injunction. The court therefore denies as premature plaintiffs' motion for partial summary judgment on Count II of the amended complaint.

■ The court, however, declines to grant defendants' motion for summary judgment on that claim. Although the court concludes that plaintiffs fail to make the requisite showing of immediacy concerning the implementation of a wage scale, the court notes that if implemented, the proposed wage scale would likely violate § 1 of the Sherman Act. *See Brown v. Pro Football, Inc.,* Civ. No. 90–1071, slip op. at 19–23, 1992 WL 88039 (D.D.C. March 10, 1992) (applying the rule of reason and granting players' motion for partial summary judgment on the issue of the NFL defendants' antitrust liability for fixing the wages of developmental squad players in the 1989 NFL season). The court further concludes that such a wage scale would likely injure plaintiffs by eliminating their ability to engage in individual salary negotiations with their NFL employers and that the injury is of the type that the Sherman Act was designed to prevent. *See, e.g., id.* at 9–13 (holding that the NFL defendants' agreement to fix players' wages was con-

---

**5.** The member clubs have all entered into contracts with players for the 1993 season. According to defendants' records, at least 370 players have signed contracts for the 1993 season, 69 players have signed for the 1994 season, 22 players have signed contracts for the 1995 season and 2 players have signed contracts for the 1996 season.

duct to which the Sherman Act applied); *Mackey v. National Football League*, 543 F.2d 606, 620–23 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977) (Rozelle Rule, a forerunner of the Plan B right of first refusal and compensation restraints, found to violate § 1 of the Sherman Act). The court further notes that if plaintiffs were still playing professional football at that time, they would likely have standing to challenge a wage scale. *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1175 & n. 2 (D.C.Cir.1978) ("athletes have standing to challenge player restrictions in professional sports since the restraints operated directly on, and to the detriment of, the employee"); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 338c (1990 Supp.) ("Were there a genuine conspiracy to suppress wages, the plaintiff employees would be appropriate victims to litigate the matter"). The court further determines that, although the threat is not significant at the present time, such a threat does exist, based on the wage scale proposed in 1988:

> Effective February 1, 1993, delete Article XV [First Refusal/Compensation System] and amend [Collective Bargaining Agreement] to eliminate all references to individual player bargaining and to establish a League-wide wage scale, the details of which will be provided in the course of bargaining.

(1988 Wage Scale Proposal, Donlan Depo. Ex. 2 (attached as Ex. A to Roman Decl.)). Another league document, which was sent to all players, summarized two alternative comprehensive bargaining proposals (Plan A and Plan B) and described the proposed wage scale element of Plan B as follows:

> No more individual player contract bargaining after 1993.
> [Individual bargaining] replaced in 1993 with Leaguewide wage scale covering all players.

(Schmidt Depo. Ex. 2 (attached as Ex. B to Roman Decl.)). The court further notes that defendants have unilaterally implemented most of the other proposed provisions of Plan B. The court thus concludes that plaintiffs present evidence of a threat of antitrust injury, which although insufficient to justify permanent injunctive relief at the present time, is sufficient to defeat defendants' motion for summary judgment on Count II. Accordingly, the court denies as premature plaintiffs' motion for partial summary judgment on Count II, denies defendants' motion for summary judgment on Count II, refuses to issue a permanent injunction at the present time and retains jurisdiction over plaintiffs' claim.[6]

### 2. *Defendants' Motion for Summary Judgment on Count I and Count II of the Amended Complaint*

The NFL defendants also move for summary judgment on all of plaintiffs' claims on two bases: first, defendants contend that they function as a single economic entity and thus are incapable of conspiring within the meaning of § 1 of the Sherman Act, 15 U.S.C. § 1; and second, defendants argue that the antitrust laws do not apply to restraints that operate solely within a labor market. The court will address each argument in turn.

■ Defendants contend that the NFL and its twenty-eight member clubs are incapable of conspiring because they function as a single economic entity. In support of that contention, defendants rely on the declaration of Commissioner Tagliabue in which he states that the business relationship among the NFL member clubs is not that of independent economic competitors but rather that co-owners engaged in a common business enterprise, the production and marketing of professional football entertainment.[7] (Tagliabue Decl. ¶ 2 (Dec.

---

**6.** Based on its determination that neither side is entitled to summary judgment on Count II, the court does not address defendants' contentions that plaintiffs' claims in Count II should be judged under the rule of reason, that plaintiffs fail to carry their burden under that rule or that defendants' proffered justification, the pro-

motion of competitive balance among member teams, creates a genuine issue of material fact.

**7.** Commissioner Tagliabue also makes various other assertions concerning the structure and operation of the league in his attempt to demonstrate that the NFL member clubs constitute a joint venture.

4, 1991)). That argument, however, has been expressly rejected by both the Ninth Circuit, in *Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381 (9th Cir.), *cert. denied,* 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984), and the Second Circuit, in *North American Soccer League v. National Football League,* 670 F.2d 1249, 1256–58 (2d Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982); *cf. Brown v. Pro Football, Inc.,* Civ. No. 90–1071, slip op. at 16–19 (noting that although the parties did not dispute the league's status as a joint venture, the league's wage restraint for developmental squad players violates the rule of reason as

a matter of law).[8] Although Commissioner Tagliabue makes various assertions regarding the structure and operation of the National Football League,[9] he fails to suggest in what manner the current structure materially differs from that which existed when the identical "single economic entity" argument was raised by the NFL defendants and rejected by the Ninth and Second Circuits.[10] Moreover, in *Los Angeles Memorial Coliseum Commission,* the Ninth Circuit acknowledged that it was necessary for the member clubs to cooperate to some extent in order to produce NFL football games, but nevertheless concluded that the teams' cooperation did not preclude applica-

---

**8.** The court notes that defendants' position has also been implicitly rejected in all of the other cases that have found that various NFL player restraints violate section 1 of the Sherman Act, including the Eighth Circuit's decision in *Mackey v. National Football League,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), the District of Columbia Circuit's decision in *Smith v. Pro Football, Inc.,* 593 F.2d 1173 (D.C.Cir.1978), and the district court's decision in *Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal.1974), *aff'd in part, dismissed in part as moot,* 586 F.2d 644 (9th Cir.1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979).

In *Mackey,* the Eighth Circuit expressly held that NFL player restraints similar to those challenged in the present case were unlawful under section 1 of the Sherman Act. *Id.* at 620–23. Although the Eighth Circuit noted that the NFL member clubs were not business competitors in the traditional sense, and therefore rejected application of the per se rule, *id.* at 619, the court nevertheless found that the challenged restraint violated section 1 under the rule of reason, thus implicitly determining that the NFL member clubs were capable of conspiring for purposes of the Sherman Act. *Id.* at 620–22.

**9.** The court also observes that not all of the NFL defendants seem to agree with his characterization. For example, Val Davis, principal owner of the defendant Los Angeles Raiders, recently testified in this case that the NFL member clubs are "vicious competitors," a statement consistent with the position that he took in the *Los Angeles Memorial Coliseum Commission* case.

**10.** The facts on which those cases relied include:
1. The NFL is organized as an unincorporated association of 28 separately owned professional football teams, each operated through a distinct corporation or partnership. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1389–90; *North American Soccer League,* 670 F.2d at 1252;
2. No NFL member club shares its expenses, capital expenditures, profits or losses with any other member. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1390; *North American Soccer League,* 670 F.2d at 1252;
3. Each club is managed independently, "making its own decisions concerning ticket prices, player acquisitions and salaries, the hiring of coaches and administrators and the terms of their stadium leases." *Los Angeles Memorial Coliseum Comm'n v. National Football League,* 519 F.Supp. 581, 582 (C.D.Cal. 1981);
4. Although a substantial portion of NFL revenues are shared, each member club also derives separate revenues from other sources, including revenues from local television and radio, parking, concessions and luxury box seats. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1390; *North American Soccer League,* 670 F.2d at 1252;
5. Despite the sharing of some revenues, profits vary widely from team to team. The teams do not exchange or share their accounting books or records. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1390; *North American Soccer League,* 670 F.2d at 1252;
6. NFL members compete in the acquisition of coaches, management personnel and, subject to various restraints, players. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1390; *North American Soccer League,* 505 F.Supp. 659, 666 (S.D.N.Y.1980);
7. NFL members located in the same geographic areas engage in direct competition for fan support, media space and local television and radio revenues. *See Los Angeles Memorial Coliseum Comm'n,* 726 F.2d at 1390. The Ninth Circuit further noted that clubs from other areas are at least potential competitors because they have the capacity to move into each other's territories. *Id.*

tion of § 1 of the Sherman Act to the agreements by which such cooperation was allegedly effected. 726 F.2d at 1389. The Second Circuit also noted that the NFL member clubs are separate economic entities engaged in a joint venture [11] but still found them subject to the Sherman Act:

> The theory that a combination of actors can gain exemption from § 1 of the Sherman Act by acting as a "joint venture" has repeatedly been rejected by the Supreme Court and the Sherman Act has been held applicable to professional sports teams by numerous lesser federal courts.
>
> . . . .
>
> The characterization of NFL as a single economic entity does not exempt from the Sherman Act an agreement between its members to restrain competition. To tolerate such a loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects.

670 F.2d at 1257.

Defendants, however, argue that the *North American Soccer League* and *Los Angeles Memorial Coliseum Commission* cases are distinguishable because they were decided prior to the Supreme Court's decision in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In *Copperweld*, the Supreme Court examined the "narrow issue of whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act", *id.* at 767, 104 S.Ct. at 2739–40, and concluded that they are incapable of conspiring for purposes of the Act. *Id.* at 770, 104 S.Ct. at 2741. Defendants apparently contend that *Copperweld* overrules a vast body of Supreme Court and lower court decisions that have held that arrange-

ments between separate economic entities engaged in a joint venture, including teams in professional sports leagues, are subject to scrutiny under the Sherman Act. *E.g., Radovich v. National Football League*, 352 U.S. 445, 449–52, 77 S.Ct. 390, 392–94, 1 L.Ed.2d 456 (1957); *Los Angeles Memorial Coliseum Comm'n*, 726 F.2d at 1387–90; *North American Soccer League*, 670 F.2d at 1256–58; *Smith v. Pro Football, Inc.*, 593 F.2d at 1173; *Mackey*, 543 F.2d at 617–18 ("[i]n other cases concerning professional sports, courts have not hesitated to apply the Sherman Act to club owner imposed restraints on competition for players' services"). The court believes that defendants' interpretation of *Copperweld* is irreconcilable with the Supreme Court's decision in *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), in which the Court applied § 1 to restraints that the NCAA claimed were necessary to facilitate the joint venture of a college football league. Although acknowledging that college football was "an industry in which horizontal restraints on competition are essential if the product is to be available at all", *id.* at 101, 104 S.Ct. at 2960, the Court nevertheless determined that the challenged restraints were subject to an abbreviated rule of reason analysis, expressly relying on precedent that held that "joint ventures have no immunity from antitrust laws." *Id.* at 113, 104 S.Ct. at 2966–67. Based on the foregoing, the court rejects defendants' contention that *Copperweld* immunizes them from antitrust liability, concludes that the NFL defendants are not a single economic entity for purposes of liability under § 1 of the Sherman Act and denies their motion for summary judgment on that basis.

■ Defendants further contend that plaintiffs' claims fail because the challenged restraints operate solely in a labor market and are therefore outside the scope

---

11. Like the Ninth Circuit, the Second Circuit focused on the characteristics that demonstrate the economically independent nature of the clubs, emphasizing that:

> [i]n spite of sharing of some revenues, the financial performance of each team, while

related to that of the others, does not, because of the variables in revenues and costs as between member teams, necessarily rise or fall with that of the others.

670 F.2d at 1252.

of the antitrust laws. In a footnote in their brief, however, defendants concede that the Eighth Circuit has expressly rejected that argument in two prior cases: *Powell v. National Football League*, 930 F.2d 1293, 1298–99 & n. 4 (8th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991) and *Mackey*, 543 F.2d at 616–18. Although defendants, without explanation or authority, assert that the Eighth Circuit has failed to arrive at the "correct result", those decisions are obviously controlling in the present case.[12] Moreover, Supreme Court precedent clearly holds that the antitrust laws apply to restraints that operate solely within a labor market. *E.g., Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (applying the per se rule to condemn a boycott by attorneys seeking to increase their fees for providing legal services to indigents); *Radovich*, 352 U.S. at 449–52, 77 S.Ct. at 392–94; *see also* II Phillip Areeda & Donald F. Turner, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶¶ 338b & 338c, at 199 (1978) (noting that antitrust laws protect buyers and sellers of employment services and that courts have permitted football players affected by league rules "to challenge conspiracies among their employers with respect to the employment of those in the plaintiffs' class"). Based on the foregoing, the court rejects defendants' contention that restraints that operate solely in a labor market are outside the scope of the antitrust laws and denies their motion for summary judgment on that basis.

In summary, the court rejects both bases on which defendants' move for summary judgment on Count I and II of the amended complaint and denies that motion in its entirety.

**12.** Moreover, as plaintiffs note in their brief in support of their motion for partial summary judgment concerning defendants' monopoly power in relevant markets, it is probable that defendants are collaterally estopped from arguing in the Eighth Circuit that a labor market is outside the reach of the antitrust laws based on the Eighth Circuit's prior holdings in *Powell*, 930 F.2d at 1297–99 & n. 4 and *Mackey*, 543 F.2d at 616–18. *Mackey* and *Powell* involved player

### 3. Defendants' Motion for Partial Summary Judgment on Plaintiffs' Damages Claims

Defendants move for partial summary judgment on plaintiffs' damage claims pursuant to Count I of the amended complaint, arguing that plaintiffs cannot recover treble damages for the Plan B Right of First Refusal/Compensation System (hereinafter "first refusal/compensation system") for the 1990 and 1991 football season. Defendants first contend that this court's previous rulings in the *Powell* litigation establish that the risk of antitrust damage liability does not attach until the date on which a judicial determination first renders the nonstatutory labor exemption inapplicable.[13] Defendants further argue that the standards governing the retroactive application of judicial decisions set forth in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), require that this court's May 23, 1991, decision in *McNeil* concerning the expiration of the nonstatutory labor exemption be applied only prospectively. The court will examine each argument in turn.

### A. The Court's Prior Rulings in Powell

Defendants argue that in *Powell v. National Football League*, this court created a rule that "the NFL's risk of damage liability does not attach on the date the labor exemption expires, but rather only when a court first determines that the exemption no longer applies." In *Powell*, this court determined that:

Under the Court's formulation, a determination that the parties have reached impasse as to a particular issue results in termination of the labor exemption pro-

restraints that are the predecessors of the restraints at issue in the present case.

**13.** Although defendants maintain that the Plan B right of first refusal/compensation system is valid under the Sherman Act, they argue that they are entitled to summary judgment on plaintiffs' damage claims for the 1990 and 1991 seasons regardless of whether that system is ultimately deemed lawful.

tecting that particular provisions. In the instant case, once the parties reach impasse concerning the player restraint provisions, those provisions will lose their immunity and further imposition of those conditions may result in antitrust liability.

678 F.Supp. 777, 788–89 (D.Minn.1988) (footnote omitted) (*"Powell I"*). The court restated its position at a June 17, 1988, hearing concerning the *Powell* plaintiffs' motion for a preliminary injunction to prevent further implementation of the right of first refusal/compensation system:

The court did hold that, following the expiration of the Collective Bargaining Agreement, the labor exemption would continue to shield the existing system of player restraints until the parties reached an impasse in their negotiation on those issues. Once the parties reached impasse, the system of player restraints would lose its immunity and the antitrust laws would apply.

Transcript of Proceedings, *Powell v. National Football League*, No. 4–87–917, at 113 (D.Minn. June 17, 1988) ("Transcript"). Thus, this court held that the nonstatutory labor exemption for a particular issue would end only when the parties had reached a judicially determined impasse concerning that issue.

This court, however, did not thereby rule that the nonstatutory labor exemption would require such a judicial determination no matter what event triggers the expiration of the exemption. This court held in *Powell I* that:

After balancing the various competing interests, the Court concludes that proper accommodation of labor and antitrust interests requires that a labor exemption relating to a mandatory bargaining subject survive expiration of the collective bargaining agreement until the parties reach impasse *as to that issue;* thereafter, the term or condition is no longer immune from scrutiny under the antitrust laws, and the employer runs the risk that continued imposition of the condition will subject the employer to liability.

*Powell I*, 678 F.Supp. at 788 (emphasis in the original). Thus, after balancing the competing interests of labor and antitrust law, this court merely chose what it determined to be an appropriate endpoint, a judicially determined impasse.

After defining an endpoint for nonstatutory labor exemption, this court further concluded that the NFL defendants would be liable for any damages flowing from the challenged restraint, the right of first refusal/compensation system, only after the date on which the court determined that the parties had reached impasse on that restraint, June 17, 1988. *See Powell v. National Football League*, 711 F.Supp. 959, 965–66 (D.Minn.1989) (*"Powell II"*) (noting at the hearing on June 17, 1988, this court determined that impasse occurred as of the date of that hearing, *citing* Transcript at 113–16). In *Powell II*, this court reasoned that:

defendants were protected from plaintiffs' antitrust allegations up until the point of impasse, and since impasse was not found until June 17, 1988, plaintiffs' claims for antitrust damages regarding the [right of first refusal/compensation system] before that date are without merit.

*Id.* at 965–66. Thus, this court held that damages were available to the *Powell* plaintiffs only after the endpoint of the nonstatutory labor exemption, that is, a judicially determined impasse, occurred. *Id.* This court, however, did not hold that in general a defendant's antitrust damage liability would begin only upon judicial determination of the viability of a particular claim. The court thus concludes that defendants' argument misconstrues its rulings in *Powell I* and *Powell II*.

Moreover, the rule adopted by this court in *Powell I* was expressly rejected by the Eighth Circuit, which held that:

The district court's impasse standard treats a lawful stage of the collective bargaining process as misconduct by defendants, and in this way conflicts with federal labor laws that establish the collective bargaining process, under the supervision of the National Labor Relations

Board, as the method for resolution of labor disputes.

. . . .

[W]e hold that the antitrust laws are inapplicable under the circumstances of this case as the nonstatutory labor exemption extends beyond impasse.

*Powell v. National Football League,* 930 F.2d 1293, 1302, 1304 (8th Cir.1989) (footnote omitted) (*"Powell III"*), *cert. denied,* —— U.S. ——, 111 S.Ct. 711, 112 L.Ed.2d 700 (1991). Thus, this court's endpoint for the nonstatutory labor exemption, a judicially determined impasse, was overturned by the Eighth Circuit.

After rejecting impasse as the appropriate endpoint, the Eighth Circuit further stated that:

We are not compelled to look into the future and pick a termination point for the labor exemption.

*Id.* at 1303. Although refusing to define the exact point at which the nonstatutory labor exemption would end, the Eighth Circuit indicated that the exemption would continue to protect the NFL defendants' player restraints as long as an "ongoing collective bargaining relationship" existed between the parties. *Id.*

Relying on the Eighth Circuit's decision in *Powell III,* this court subsequently determined in the present case that the nonstatutory labor exemption ended during November or December of 1989, because by then, the players were no longer engaged in an "ongoing collective bargaining relationship" with defendants. 764 F.Supp. 1351, 1358–59 (D.Minn.1991) (holding in *McNeil* only, although case is captioned *Powell v. National Football League*) (*"McNeil I"*).[14]

Based on this court's rulings in *Powell I* and *Powell II,* defendants argue that they are not liable in the present case for any damages that occurred prior to the date on which this court again judicially determined that the nonstatutory labor exemption had ended, that is, on May 23, 1991, the date of this court's decision in *McNeil I.* The court, however, rejects that contention. In *Powell I,* this court concluded that the triggering event, impasse, was one that by definition actually required a judicial determination to become operative. 678 F.Supp. at 788–89 (distinguishing impasse which occurs as a stage in the bargaining relationship from judicially determined impasse which ends the nonstatutory labor exemption). Thus, the relevant event for the accrual of damages in *Powell,* the judicial determination of impasse, necessarily occurred on the date on which the court determined that judicial impasse occurred. Accordingly, in *Powell II,* this court granted the NFL defendants' motion to dismiss the *Powell* plaintiffs' damage claims prior to June 17, 1988. 711 F.Supp. at 965–66. That determination, however, was premised solely on the court's finding that impasse had been reached as of that date. 711 F.Supp. at 965 (citing Transcript, at 113–16). That determination did not, however, reflect an intention to modify traditional damage analysis by tying the accrual of damages to the date on which a court issues a decision; this court merely held that antitrust damages were available once the relevant event, the date of a judicially determined impasse, triggered the end of the nonstatutory labor exemption. 711 F.Supp. at 965–66.

After the Eighth Circuit rejected that standard in *Powell III,* this court deter-

**14.** In *Powell,* this court distinguished between the NFL's conduct before and after November 6, 1989, when ruling on plaintiffs' class decertification motion; that distinction was based on the parties' agreement, for purposes of that motion only, that the labor exemption ended as of November 6, 1989. *Powell v. National Football League,* 139 F.R.D. 381, 383 (D.Minn.1991). In the present case, the court notes that the labor exemption ended some time in November or December of 1989, and no later than December 5, 1989, the date on which the NFLPA player representatives, in response to the players' peti-

tions, voted to end the NFLPA's status as the players' collective bargaining representative. *McNeil I,* 764 F.Supp. at 1356. Thus, for purposes of the present case, the court has not yet determined the exact date on which the nonstatutory labor exemption ended, although it notes that the expiration occurred sometime between November 6, 1989, and December 5, 1989. *See id.; Powell,* 139 F.R.D. at 383 (stating that as a result of the parties' agreement, the court assumed that the labor exemption ended as of November 6, 1989, for purposes of the decertification motions in *Powell* only).

mined, in accordance with the Eighth's Circuit's decision, that in the present case the labor exemption ended as of the occurrence of a different triggering event, the end of the parties' collective bargaining relationship. *McNeil I*, 764 F.Supp. at 1358–59. *McNeil I*, however, makes clear that the relevant event, the termination of the collective bargaining relationship, does not depend on either a judicial determination or NLRB decertification:

> but rather depends on whether a majority of the employees in a bargaining unit support a particular union as their bargaining representative.

*McNeil I*, 764 F.Supp. at 1357. The court therefore determined in its May 23, 1991, order, that the triggering event, the termination of the collective bargaining relationship, occurred roughly eighteen months before the court's decision. *McNeil I*, 764 F.Supp. at 1356–59.

■ In the *Powell* litigation, this court held that the NFL defendants' damage liability did not attach until the date on which the nonstatutory labor exemption ended. The court concludes that the same rule should apply in the present case and thus, it is the date of the triggering event that is significant for purposes of the accrual of damages, not the date on which this court issued its decision concerning the termination of the exemption. The court thus rejects defendants' argument that damage liability commences only upon a judicial determination of the viability of a particular claim and holds that defendants are liable for antitrust damages from the date of the triggering event, that is, when the collective bargaining relationship between the NFL and the NFLPA terminated.[15]

Based on the foregoing, the court rejects defendants' contention that this court's prior rulings require that their antitrust liability commences only after the date of the May 23, 1991, order and holds that any antitrust damages accrue from the date on which the collective bargaining relationship ended, that is no later than December of 1989. *See McNeil I*, 764 F.Supp. at 1356–59.

## B. *The Chevron Standard of Retroactive Application*

Defendants further contend that the Supreme Court's decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), mandates that this court's May 23, 1991, decision in *McNeil I* must be applied only prospectively. In *Chevron*, the Supreme Court set forth three factors to be examined when determining whether a judicial decision should be applied retroactively: (1) whether the decision established a new principle of law; (2) whether retroactive application will advance or subvert the purpose of the decision; and (3) whether inequities will result from retroactive application. *Id.* at 106–07, 92 S.Ct. at 355–56.[16] The court is to evaluate those factors in light of the particular circumstances of the present case. *See Dautremont v. Broadlawns Hosp.*, 827 F.2d 291, 295 (8th Cir.1987).

■ Turning to the first factor, the Supreme Court has determined that the factor requires that the decision "establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. The court first determines

---

**15.** The court notes that if it were to adopt defendants' position, plaintiffs' damage claims would be dependent on the vicissitudes of the federal court system, the nature of a particular judge's docket, the tactical delays of adversaries and any other delays inherent in the discovery process.

**16.** *Cf. Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (five justices determining to retroactively apply newly announced federal

statute of limitations for Rule 10b–5 security fraud claims without mentioning the *Chevron* analysis); *James B. Beam Distilling Co. v. Georgia,* —— U.S. ——, 111 S.Ct. 2439, 2451, 115 L.Ed.2d 481 (1991) (O'Connor, J., dissenting) (noting that majority and concurring opinions in *Beam* retroactively apply new rule to all parties without addressing the *Chevron* analysis). Although the continued viability of the *Chevron* analysis may be in doubt after the Court's decisions in *Lampf* and *Beam,* this court nevertheless analyzed *McNeil I* under *Chevron.*

that its ruling of May 23, 1991, in *McNeil I*, striking defendants' labor exemption defense as a result of the termination of the parties' collective bargaining relationship, did not establish a "new principle of law" because it neither overruled "clear past precedent" nor decided "an issue of first impression whose resolution was not clearly foreshadowed." *Chevron*, 404 U.S. at 106, 92 S.Ct. at 355. The court first notes that in 1976, the Eighth Circuit clearly held that the NFL defendants' "restraints on competition within the market for players' services fall within the ambit of the Sherman Act." *Mackey*, 543 F.2d at 618 (analyzing the Rozelle Rule, a predecessor of the restraints challenged in the present case). The Eighth Circuit further noted that:

> In other cases concerning professional sports, courts have not hesitated to apply the Sherman Act to club owner imposed restraints on competition for players' services.

*Id.* at 617 (citing cases).

The court also concludes that the Eighth Circuit's holding in *Powell III* not only foreshadowed this court's ruling in *McNeil I*, but effectively predetermined such ruling. Although the majority in *Powell III* declined to pick the exact point at which the labor exemption would end, the opinion clearly indicated that: (1) the NFL defendants' restraints on player services could offend the Sherman Act and they were not forever exempt from the antitrust laws, 930 F.2d at 1303, and (2) that the nonstatutory labor exemption would protect them only as long as "the labor relationship continues". *Id.* at 1304.[17] The *Powell III* dissent further stated that the bargaining relationship could be terminated:

> either by an NLRB decertification proceeding or by abandonment of bargaining rights by the union.

*Id.* at 1305 (Heaney, J., dissenting).

Defendants nevertheless contend that the Eighth Circuit's opinion "did not ad-

dress the issue of what actions would be legally sufficient to terminate the labor exemption." (Defendants' Brief in Support of their Motion for Partial Summary Judgment on Plaintiffs' Damage Claims at 11 (Nov. 15, 1991) ("Defendant's Brief")). The court, however, rejects that contention. First, defendants' prior concessions demonstrate that they knew that the nonstatutory labor exemption would end if there were no ongoing collective bargaining relationship between the NFL and the NFLPA, and that such a relationship could not exist if there were no union. In 1987, the NFL defendants argued to this court that the labor exemption survived either "indefinitely ... [or] ... for the duration of a collective bargaining relationship." *Powell I*, 678 F.Supp. at 787–88. In response to defendants' argument, this court specifically observed in *Powell I* that:

> [g]enerally the collective bargaining relationship between an employer and a particular union exists for as long as that union continues to be the recognized bargaining representative of a majority of the employees.

*Id.* at 788 n. 18. The NFL defendants subsequently conceded in *Powell*, in their brief on appeal to the Eighth Circuit, that a prerequisite to the continued operation of the nonstatutory labor exemption was that "the affected employees continue to be represented by a labor union vested with collective bargaining authority under the labor laws." Brief of Defendants–Appellants National Football League, *Powell v. National Football League*, at 17–18 (April 3, 1989); *see also id.* at 24–25, 31, 40–41 & 49. The Eighth Circuit also noted that concession in *Powell III*:

> [t]he League concedes that the Sherman Act could be found applicable ... if the affected employees ceased to be represented by a certified union.

930 F.2d at 1303 n. 12.

The court further rejects defendants' claim that they were uncertain whether the

---

17. The court further concludes that if defendants had any legitimate uncertainty about whether the nonstatutory labor exemption would end at some point, that uncertainty should have been dispelled as of November 1, 1989, the date on which the Eighth Circuit re-

jected their infinite immunity defense. 930 F.2d at 1303–04. The court thus concludes that the NFL defendants knew, or should have known, at least as of November 1, 1989, that the exemption would end if the collective bargaining relationship ended.

players' rejection of the NFLPA as their collective bargaining representative would be sufficient to end the ongoing bargaining relationship. First, this court noted in 1987 that a collective bargaining relationship generally continues between a union and employer only as long as a majority of the employees support that union as their bargaining representative. *Powell I,* 678 F.Supp. at 788 n. 18. Moreover, labor law has long recognized the voluntary nature of union representation. *McNeil I,* 764 F.Supp. at 1356–57 ("the National Labor Relations Act 'guarantees the employees the right to bargain collectively with representatives of their own choosing'", *citing NLRB v. Local 103, International Ass'n of Bridge, Structural and Ornamental Iron Workers,* 434 U.S. 335, 344, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978) (citing 29 U.S.C. § 157)). Defendants' management council further acknowledged, in a memorandum sent to member teams dated February 21, 1990, and sent to the member teams, that "the NFLPA has abandoned the representation of NFL players." Defendants' continued efforts to characterize the NFLPA's abandonment of its collective bargaining role as ineffective "self-serving unilateral declaration[s]" (Defendants' Brief at 7) are also belied by defendants' conduct. After a majority of the active players signed petitions revoking the NFLPA's authority to bargain on their behalf, defendants unilaterally imposed major changes in players' working conditions, including lengthening the playing season to seventeen weeks and changing players' insurance benefits. *McNeil I,* 764 F.Supp. at 1358–59.[18] As this court previously observed, if defendants truly believed that the NFLPA retained its role as the players'

bargaining representative, their unilateral actions would constitute an unfair labor practice. *See id.* at 1359 n. 8. Moreover, despite their insistence that the NFLPA continues to function as a union, defendants neglected to file a charge, pursuant to 29 U.S.C. § 160(b), with the NLRB asserting that the NFLPA engaged in an unfair labor practice by unlawfully refusing to bargain with defendants. Defendants allowed the six-month limitations period for filing such a charge to expire.

Defendants finally contend that the court's May 23, 1991, ruling announced a new principle of law because prior to that decision defendants believed that the NFLPA had to formally decertify in order to terminate the bargaining relationship and the nonstatutory labor exemption. Defendants' Brief at 11–12; *see also McNeil I,* 764 F.Supp. at 1356. As this court previously determined, however, the majority in *Powell III* suggested, and the dissent clearly stated, that the labor exemption would end "either by an NLRB decertification proceeding *or* by abandonment of bargaining rights by the union." 930 F.2d at 1305 (Heaney, J., dissenting) (emphasis added). Thus, *Powell III* clearly foreshadowed this court's ruling in *McNeil I,* 764 F.Supp. at 1358. Other labor law precedents also foreshadowed *McNeil I. See, e.g., NLRB v. Gissel Packing Co.,* 395 U.S. 575, 596–97, 89 S.Ct. 1918, 1930–32, 23 L.Ed.2d 547 (1969) (the existence of a bargaining relationship does not require NLRB certification; majority support may be achieved in various other ways); *NLRB v. Superior Fireproof Door & Sash Co.,* 289 F.2d 713, 719 (2d Cir.1961) ("[d]ecertification is a time-consuming endeavor" that is not necessary to end duty to bargain).[19] The court

---

18. In *McNeil I,* this court further observed that shortly after the Eighth Circuit's decision in *Powell III:*
 (i) the NFLPA's Executive Committee voted to renounce collective bargaining;
 (ii) the Committee then advised the NFL defendants that it would no longer represent players in the grievance process or engage in collective bargaining;
 (iii) the NFLPA's player representatives adopted new bylaws ending the organization's status as players' collective bargaining representative; and

 (iv) the NFLPA filed a labor termination notice with the United States Department of Labor.
 764 F.Supp. at 1356.

19. The court thus rejects defendants' contention that "there was not a single case ... that would have foreshadowed [an] opinion that the NFLPA's unilateral abandonment of collective bargaining rights would be sufficient to nullify the NFL's nonstatutory labor exemptions." Defendant's Brief at 12 n. 5. First, the dissent in *Powell III* clearly suggested such a result. The

finally notes that in a ruling dated June 26, 1991, the NLRB also determined that the NFLPA's December 5, 1989, restructuring and reorganization was sufficient to terminate its status as a collective bargaining agent and a labor organization. 1991 WL 144468 at *2, *4 n. 8 (June 26, 1991).[20] Based on the foregoing, the court concludes that *McNeil I* did not establish a new principle of law or decide an issue of first impression whose resolution was not clearly foreshadowed. *Chevron,* 404 U.S. at 106, 92 S.Ct. at 355.

■ Defendants also contend that the second *Chevron* factor, the underlying purpose of the decision, favors prospective application of *McNeil I* because such application advances the interests of federal labor policy. Defendants cite numerous cases that express a "consistently strong concern for national labor policy" and that seek to "promote the collective bargaining process." Defendants' Brief at 13. The court determines, however, that the cases on which defendants rely are distinguishable because they all involved an ongoing bargaining relationship in which an existing labor union could be encouraged to continue bargaining with management. The interests underlying federal labor law were thus implicated by the existence of an ongoing bargaining relationship. *Cf. Powell III,* 930 F.2d at 1301 ("Congress has developed 'a separate body of labor law specifically designed to protect and encourage the organizational and representational

activities of labor unions' " *quoting Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 539–40, 103 S.Ct. 897, 909–10, 74 L.Ed.2d 723 (1983)). The court concludes, however, that retroactive application of *McNeil I* will not undermine federal labor policy because it will not disrupt any collective bargaining process: there is no ongoing bargaining relationship or labor representative with whom defendants can bargain. *Cf.* Note, *Releasing Superstars from Peonage: Union Consent and the Nonstatutory Labor Exemption,* 104 Harv.L.Rev. 874, 882 (1991) (arguing that "[a] labor exemption not dependent on union consent—such as the exemption adopted [by the Eighth Circuit] in *Powell*—proves not to accommodate but rather to conflict with labor policy by impairing the right to unionize and by adjusting bargaining power in favor of employers").

The court further concludes that if it were to apply *McNeil I* only prospectively, such application would subvert other important national policies, those underlying the federal antitrust laws. The Supreme Court has recognized that federal antitrust interests represent our "charter of economic liberty." *Northern Pac. R.R. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517–18, 2 L.Ed.2d 545 (1958). The court thus concludes that the second *Chevron* factor supports retroactive application of *McNeil I* because such application does not

court further notes that plaintiffs cited a number of such cases in their motion for partial summary judgment on the labor exemption issue in *McNeil.* (Plaintiffs' Brief in Support of their Motion for Partial Summary Judgment at 11–15 (Nov. 2, 1990)).

In evaluating the effectiveness of the NFLPA's disclaimer of its status as a labor union, the NLRB also cited various cases in support of that proposition when ruling that:

In order for a union's disclaimer in representing a particular unit to be valid, it must be unequivocal, made in good faith, and unaccompanied by inconsistent conduct. We conclude that there has been no conduct by the NFLPA which is inconsistent with its disclaimer. Moreover, when a union has made a valid disclaimer, no question concerning representation exists and *a decertification election will not be held because it would be an unnecessary waste of time and resources.* In

addition, the fact that the disclaimer was motivated by "litigation strategy," i.e., to deprive the NFL of a defense to players' antitrust suits and to free the players to engage in individual bargaining for free agency, is irrelevant so long as the disclaimer is otherwise unequivocal and adhered to.

1991 WL 144468 at *4 n. 8 (June 26, 1991) (emphasis added).

20. The ruling concluded that the NFLPA's:

disclaimer is valid. Furthermore, the NFLPA has not merely disclaimed representative status; it has restructured itself so that it no longer functions as a collective-bargaining agent. Accordingly, the NFLPA is not a labor organization as defined in Section 2(5) of the Act.

*Id.* at *2 (footnote omitted).

undermine federal labor policy and advances federal antitrust policy.

Defendants finally contend that the third *Chevron* factor, the balance of equities, favors prospective application of *McNeil I* because defendants justifiably relied on the Eighth Circuit's decision in *Powell III* and plaintiffs failed to seek a prompt determination of the labor exemption issue after *Powell III*.

■ Turning to their reliance argument, defendants specifically contend that they relied "on the Eighth Circuit's holding that the right of first refusal/compensation system portion of Plan B was immune from antitrust scrutiny until this Court specified the point in time when the exemption expired", citing *Powell III*, 930 F.2d at 1303, as support for that assertion. The court determines that defendants misconstrue *Powell III*; the Eighth Circuit never held that defendants enjoyed such immunity, either on the page cited by defendants or in any other part of the opinion. Thus, the court rejects defendants' claim that prior to *McNeil I* their conduct was protected and only placed in jeopardy after this court's May 23, 1991, decision.

The court further rejects defendants' claim that their reliance on *Powell III* was justifiable. As previously noted, *Powell III* clearly put defendants on notice that they were not entitled to permanent immunity from antitrust scrutiny, 930 F.2d at 1303, a position which echoes the Eighth Circuit's decision in *Mackey*, 543 F.2d at 618. Other NFL player restraints similar to those at issue in the present case have previously been found illegal, *e.g.*, *Smith*, 593 F.2d at 1189, and in 1988, this court warned defendants that the present restraints would likely be found illegal and that they were entitled to antitrust immunity only as long as that nonstatutory labor exemption continued. *Powell v. National Football League*, 690 F.Supp. 812, 813, 818 (D.Minn. 1988). Moreover, defendants concede that they knew that players and the NFLPA were taking steps to end the labor exemption, and circulated a memorandum among member teams reflecting that awareness. (Memoranda dated Feb. 21, 1990, stating that "the NFLPA has abandoned the representation of NFL players"). The court thus determines that defendants placed themselves at risk by choosing to continue their system of player restraints "[a]fter [they were aware that] the players and the NFLPA took steps designed to end the labor exemption." *See* Defendants' Brief at 18. Having chosen to assume the risk of antitrust liability, defendants cannot avoid that choice by claiming that they justifiably relied on *Powell III* because the court concludes that any such reliance is neither justifiable nor reasonable. *See*, *e.g.*, *Dautremont*, 827 F.2d at 295 (defendant's reliance must be reasonable).[21] The

---

21. The court further concludes that the reliance cases cited by defendants fail to support their position. In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, the Third Circuit held that defendants were not liable for conduct occurring before a change in the law because the Supreme Court, on three prior occasions, had upheld such conduct under the Sherman Act. 377 F.2d 776, 788–89 (3d Cir.1967). The Supreme Court, however, expressly rejected that ruling because the change in antitrust law on which the Third Circuit relied did not involve a novel issue or require innovative principles to reach it, but rather was resolved on the basis of existing authorities. 392 U.S. 481, 495–97 & n. 12, 88 S.Ct. 2224, 2232–34 & n. 12, 20 L.Ed.2d 1231 (1968).

The other cases on which the NFL defendants rely merely emphasize the difference between genuine reliance interests and defendants' feigned unawareness. In *American Trucking Association v. Smith*, 496 U.S. 167, 110 S.Ct.

2323, 110 L.Ed.2d 148 (1990), the Supreme Court refused to retroactively invalidate state tax legislation that, when enacted, had been lawful under Supreme Court precedent. *Id.* 110 S.Ct. at 2331–33. Although recognizing the need for prospective application of new constitutional decisions, the Court noted that states and municipalities, like private individuals and entities, are responsible for anticipating developments in the law. *Id.* at 2334.

The court further rejects defendants' reliance on *Lyons v. Westinghouse Elec. Corp.*, 235 F.Supp. 526 (S.D.N.Y.1964). In declining to retroactively apply new Supreme Court doctrine to impose treble damages on Westinghouse in connection with its agency system, a system that prior decisions had upheld for more than thirty years, the *Lyons* court observed that:

Here we have an agency system which was expressly upheld by the Supreme Court in *General Electric* and later by Judge Forman as well. There can be no doubt whatever that

court thus rejects defendants' claims of reasonable reliance.

■ Defendants also contend that plaintiffs improperly delayed seeking a judicial determination of the continued viability of defendants' labor exemption defense. Despite their claim of improper delay, defendants have attempted to delay adjudication of the labor exemption issue by arguing that it presents a fact issue to be resolved by the jury.[22] The court further finds that plaintiffs did not delay the filing of either the present lawsuit or their motion for partial summary judgment on the labor exemption defense. In April 1990, plaintiffs filed claims challenging the application of Plan B restraints for the 1990 season; such claims would have been premature if they had been filed prior to that time. Plaintiffs' motion to strike defendants' labor exemption defense was also made within one month after the present action was transferred to this court.[23] The court thus rejects defendants' claim that plaintiffs have improperly delayed a decision on the labor exemption issue.

The court further concludes that the balance of equities favor retroactive application of *McNeil I.* The players took the drastic step of ending their union representation to allow their individual antitrust claims to go forward. Moreover, the players have already paid a significant price for the loss of that representation. *McNeil I,* 764 F.Supp. at 1359. The court thus determines that analysis of the *Chevron* factors justifies retroactive application of *McNeil I.*

In summary, the court concludes that neither *Chevron* nor this court's prior orders preclude retroactive application of *McNeil I.* Accordingly, the court denies defendants' motion for partial summary judgment on plaintiffs' damage claims.

4. *Plaintiffs' Motion for Partial Summary Judgment Regarding Defendants' Monopoly Power in Relevant Markets*

Plaintiffs move for partial summary judgment on the following issues:

1. There is a relevant market for the services of major league professional football players in the United States;

2. There is a relevant market for major league professional football in the United States;

3. That the NFL defendants possess monopoly power in each of those relevant markets.

Plaintiffs contend that all of those issues have been previously decided against the NFL defendants and that defendants should be collaterally estopped from relitigating those issues. Plaintiffs argue that those issues were necessary to the resolution of the prior actions, that the NFL defendants had a full and fair opportunity to litigate those issues, that the prior actions resulted in final judgments on the

*Westinghouse* relied on these decisions in continuing that system in effect. *Id.* at 537.

Unlike Westinghouse, the court finds that the NFL defendants have no decisions on which to reasonably rely to justify their unilateral imposition of Plan B once the players withdrew their support of the NFLPA and the NFLPA renounced its status as the players' collective bargaining representative. The Eighth Circuit's decision in *Powell III* clearly indicated that the labor exemption would terminate in the absence of a collective bargaining relationship. The court notes that other cases have held that a union is not required to formally decertify in order to terminate its status as a collective bargaining representative. The court further notes that other courts have determined that similar NFL player restraints violate antitrust law. Based on the foregoing, the court determines that defendants possess no reasonable reliance

interest because they have nothing on which to reasonably rely.

22. The nonstatutory labor exemption is not an affirmative element of plaintiffs' case but rather a defense asserted by defendants. The court thus notes that it is not plaintiffs' burden to initiate procedures to determine the efficacy of that defense.

23. The court further rejects defendants' claim that they were unaware of "the bases of plaintiffs' claim that an ongoing collective bargaining relationship no longer existed between the NFLPA and the NFL" until plaintiffs filed their motion for summary judgment on that issue in August 1990. Defendants' Brief at 19 n. 7. Defendants directly contradict that claim by admitting, in that same brief, that they were aware that players and the NFLPA took steps to end the labor exemption in November and December 1989. *Id.* at 18.

merits against the NFL defendants and that those decisions were upheld on appeal.

Defendants respond that they should not be collaterally estopped from relitigating those issues because the prior determinations were either mooted or conceded by the NFL defendants on appeal and that collateral estoppel would be unfair. They finally argue that no case has determined defendants' monopoly power in the relevant market for services of major league professional football players and that the jury verdict in *United States Football League v. National Football League*, 644 F.Supp. 1040, 1042 (S.D.N.Y.1986), *aff'd*, 842 F.2d 1335 (2d Cir.1988) should not be given preclusive effect for various reasons. The court will examine each issue in turn.

Collateral estoppel refers to the preclusive effect given a prior determination of fact or law in a later suit between the same parties or their privies. *See Black's Law Dictionary* 261–62 (6th ed.1990). The doctrine is applied to conserve judicial resources, and to avoid unnecessary expense and the risk of inconsistent judgments. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979); *Oldham v. Pritchett*, 599 F.2d 274, 278 (8th Cir.1979). Collateral estoppel is appropriate where:

1. The issue was identical to one raised in a prior adjudication;

2. There was a final judgment on the merits;

3. The estopped party was a party or in privity with a party to the prior adjudication; and

4. The estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Id.* at 279 (citing *Gerrard v. Larsen*, 517 F.2d 1127, 1130 (8th Cir.1975)). Where, however, a party seeks to give preclusive effect to a purely factual, as opposed to legal, determination, that party must also show that the factual "determination must have been essential to the prior judgment." *See In re Miera*, 926 F.2d 741, 742 (8th Cir.1991) (citing *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir.1983)).

In the present case, plaintiffs seek to use the doctrine offensively, thereby preventing the NFL defendants from relitigating issues that it had previously lost to other plaintiffs. *Parklane*, 439 U.S. at 329–33, 99 S.Ct. at 650–53. In *Parklane*, the Supreme Court stated that the use of offensive collateral estoppel lies within the trial court's discretion and emphasized three factors that courts should consider when making that determination:

1. Whether a plaintiff is being rewarded for failing to join in the prior action;

2. Whether the defendants had an incentive to litigate the first action "fully and vigorously"; and

3. Whether there are any procedural opportunities available to defendants in the second action that were not available to them in the first action of a "kind that might be likely to cause a different result."

*Id.* at 331–32, 99 S.Ct. at 651–52. The court will examine each of the issues in light of that standard.

A. The Existence of A Relevant Market for the Services of Major League Professional Football Players in the United States

A relevant market is defined generally as "the area of effective competition" and contains both a product element, determined by the availability and interchangeability of substitutes, and a geographic element, those areas in which the interchangeable substitutes are traded. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324–28, 82 S.Ct. 1502, 1523–26, 8 L.Ed.2d 510 (1962). In the present case, plaintiffs challenge an agreement by defendants to restrain competition between member teams for the services of professional football players. Plaintiffs assert that the relevant market for the competitive impact of that challenged restraint is the market for services of major league professional football players in the United States. *See* First Amended Compl. ¶¶ 41 & 49. Plaintiffs argue that defendants should be collaterally estopped from relitigating the definition of that relevant market because at least three

prior cases have fully litigated and resolved that issue against the NFL defendants.

 The first case on which plaintiffs rely is *Mackey v. National Football League,* in which the player plaintiffs successfully established that the ."Rozelle Rule", a restraint on free player movement that is a predecessor of the restraint challenged in the present case, was an unreasonable restraint of trade in violation of the Sherman Act. 407 F.Supp. 1000 (D.Minn. 1975), *aff'd in part, rev'd in part on other grounds,* 543 F.2d 606 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). In *Mackey,* this court expressly found that the appropriate relevant market was the market for professional football players' services. *Mackey,* 407 F.Supp. at 1008. Examining whether that finding is entitled to preclusive effect, the court first determines that resolution of the relevant market issue was essential to the *Mackey* decision because the definition of a relevant market in which competition was restricted is an essential component of a rule of reason case. *Ryco Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1231 (8th Cir. 1987) ("proof that defendant's activities had an impact upon competition in the relevant market is 'an essential element of the rule of reason case' ") (quoting *Supermarket of Homes, Inc. v. San Fernando Bd. of Realtors,* 786 F.2d 1400, 1405 (9th Cir.1986) *quoting Calculators Hawaii, Inc. v. Brandt, Inc.,* 724 F.2d 1332, 1338 (9th Cir. 1983)), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).[24] The

*Mackey* court's definition of a relevant market was specifically affirmed on appeal. *Mackey,* 543 F.2d at 616–18. The court further finds that, although the NFL defendants conceded the relevant market issue in *Mackey,* they clearly had a full and fair opportunity to contest that issue during the lengthy trial and chose not to do so. *See Mackey,* 407 F.Supp. at 1002 (55 days of trial, 63 live witnesses, 400 exhibits and 11,000 pages of trial transcript).

Plaintiffs also contend that the definition of a relevant market for professional football players' services was determined in *Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal.1974), *aff'd in part, dismissed in part as moot,* 586 F.2d 644 (9th Cir.1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). In *Kapp,* a player challenged various restraints of the NFL defendants, including the Rozelle Rule. The district court granted Kapp's motion for partial summary judgment, finding that the challenged restraints violated the rule of reason. In reaching that decision, the district court necessarily resolved the relevant market issue when it held that the Rozelle Rule restrained players' movement among the "clubs of a league that holds a virtual monopoly of professional football employment in the United States." 390 F.Supp. at 82. Thus, the trial court defined both the product and geographic elements of the relevant market.

 Defendants contend, however, that the trial court's decision in *Kapp* is not

**24.** The trial court in *Mackey* also determined that the Rozelle Rule constituted a per se antitrust violation. As a result, the NFL defendants attempt to argue that neither determination should be entitled to preclusive effect because the *Mackey* court found alternate grounds for its decision. The court, however, rejects defendants' characterization of those two holdings as "alternate grounds" because the Rozelle Rule could constitute both a rule of reason and per se violation under the antitrust laws. The decision that the Rozelle Rule violated the rule of reason provides an independent ground for the *Mackey* decision, and that determination clearly required a definition of a relevant market. The court further notes that the Eighth Circuit expressly affirmed the trial court's rule of reason decision. It is clear that when an appeals court specifically affirms one basis for a holding and

rejects another, as the Eighth Circuit did in *Mackey,* that holding which was affirmed is entitled to preclusive effect. *See Restatement (Second) of Judgments* § 27, cmt. o, at 263 ("[i]f the appellate court upholds one of these determinations as sufficient but not the other, and accordingly affirms the judgment, the judgment is conclusive as to the first determination"); *see also Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987) (same).

The court similarly rejects defendants' contention that the *Smith* decision is not entitled to preclusive effect because the Court of Appeals reversed the district's court analysis under the per se rule while upholding its decision under the rule of reason. *See infra* (discussing *Smith* ).

entitled to preclusive effect because the Ninth Circuit expressly declined to consider the issue of whether the restraints violated the Sherman Act when it affirmed judgment in favor of the NFL defendants on the issues of plaintiff's injury and damages. 586 F.2d at 649–50. Defendants argue that where an appellate court determines that an issue is moot, that issue remains undecided for purposes of collateral estoppel. The Supreme Court, however, rejected that argument in *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), finding that collateral estoppel may properly be used in situations where the appeal of an issue has been mooted, because any hardship to the party whose adverse ruling did not receive appellate review was preventable. *Id.* at 39, 71 S.Ct. at 106–07. As the Supreme Court indicated, that party could request that the adverse determination be either reversed or vacated and remanded with instructions to dismiss. *Id.* The Supreme Court encouraged such a strategy, noting that:

> [It] clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved....
>
> ....
>
> In this case the United States made no motion to vacate the judgment ... [and thus] did not avail itself of the remedy it had to preserve its rights.

*Id.* at 40, 71 S.Ct. at 107. In *Kapp*, the NFL defendants' cross-appeal on their antitrust liability under the rule of reason was dismissed when the Ninth Circuit upheld the lower court's judgment that Kapp had failed to prove any damage as a result of defendants' antitrust violation. As the Supreme Court suggested in *Munsingwear*, the NFL defendants could have asked the Ninth Circuit to vacate the trial court's liability judgment in *Kapp*. The NFL defendants chose not to do so and the court thus concludes that the trial court's determination in *Kapp* is relevant for purposes of determining whether the NFL defendants are collaterally estopped from relitigating the issue of relevant market.

Plaintiffs also contend that *Smith v. Pro Football, Inc.*, 420 F.Supp. 738 (D.D.C. 1976), *aff'd in part, rev'd in part*, 593 F.2d 1173, 1183–87 (D.C.Cir.1978), supports the use of collateral estoppel on issue of the relevant market for player services. In *Smith*, a player challenged the NFL college draft under § 1 of the Sherman Act. The district court addressed and resolved the issue of what constitutes the relevant market under the rule of reason, finding it to be "the competition among the teams for the services of college players". 420 F.Supp. at 746. In affirming the district court's finding of a rule of reason violation, the Court of Appeals held that "the draft is anticompetitive in its effect on the market for players' services, because it virtually eliminates economic competition among buyers for the services of sellers." 593 F.2d at 1186.[25]

Examining the three cases cited by plaintiffs, the court determines that the NFL defendants should be precluded from relitigating the determination that the services of major league professional football players in the United States constitutes a relevant market for purposes of plaintiffs' claims. The court finds that all of the requirements for collateral estoppel have been met: the issue of what constitutes a relevant market in the present case is identical to the issue litigated in the prior cases, the resolution of the issue was necessary to the prior decisions, there was a final judgment on the merits against the NFL defendants in both *Mackey* and *Smith*, defendants in the present case were also defen-

---

25. The court also notes that other cases involving similar challenges to player restraints in professional sports leagues have similarly found that the relevant market is the market for player services in the respective sport. *See, e.g., McCourt v. California Sports, Inc.*, 460 F.Supp. 904, 906–07 (E.D.Mich.1978) (defining the relevant market as that for National Hockey League player services and citing *Mackey* for that proposition), *vacated on other grounds*, 600 F.2d 1193 (6th Cir.1979); *Robertson v. National Basketball Ass'n*, 67 F.R.D. 691, 694 & n. 3 (S.D.N.Y. 1975) (the relevant market was the competition for professional basketball player services).

dants in the prior cases[26] and defendants had a full and fair opportunity to litigate the issue in both the *Mackey* and *Smith* cases. Based on the foregoing, the court concludes that the NFL defendants are collaterally estopped from relitigating the issue of the existence of a relevant market for the services of professional league football players in the United States.

### B. The Existence of A Relevant Market for Major League Professional Football In the United States

■ Plaintiffs further allege that there is a relevant market for major league professional football in the United States that serves as the source of the NFL defendants' power to monopolize the relevant market for professional football players' services. *See* First Amended Compl. ¶ 20. Plaintiffs rely on the jury verdict in *United States Football League v. National Football League*, 644 F.Supp. 1040, 1042 (S.D.N.Y.1986), *aff'd*, 842 F.2d 1335 (2d Cir. 1988) (*"USFL"*), to support their contention that the NFL defendants should be collaterally estopped from contesting the existence of that relevant market or their monopoly power in that market.

In the *USFL* case, a rival professional football league and its member teams brought suit against the NFL defendants, claiming that defendants had violated § 2 of the Sherman Act by, inter alia, monopolizing the market for major league professional football in the United States. After a trial of approximately ten weeks, the jury found that the NFL defendants had "willfully acquired or maintained monopoly power in a relevant market consisting of major league professional football in the United States." *USFL*, 644 F.Supp. at 1042. In rejecting the NFL defendants' motion for a judgment notwithstanding the verdict, the district court specifically affirmed the jury's finding of the relevant market as well as its verdict that the NFL defendants had willfully monopolized that market. *Id.* at 1056–57.

The court determines that the *USFL* judgment also satisfies the criteria for the application of collateral estoppel. The court first concludes that the same issues of the definition and existence of a relevant market and defendants' monopoly power in that market were raised in the *USFL* case and were essential to the USFL's proof of liability under § 2 of the Sherman Act. *See United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966) (holding that possession of monopoly power in a relevant market is an element of a § 2 claim); *Midwest Radio Co. v. Forum Publishing Co.*, 942 F.2d 1294, 1297 (8th Cir.1991). Defendants also fully litigated both the parameters of the relevant market and their possession of monopoly power in that market.[27] Moreover, the jury's finding was necessary to final judgment, final judgment was rendered against defendants on the merits of those issues and the decision was affirmed by the Second Circuit. The court thus concludes that all the requirements for applying collateral estoppel have been met and the NFL defendants are collaterally estopped from contesting the fact that major league professional football in the United States constitutes a relevant market for

---

**26.** Although defendants Tampa Bay Area NFL Football Club, Inc. and the Seattle Professional Football Club, Ltd. were not in existence and thus not named as defendants in the prior actions, the court concludes that those defendants are nonetheless bound by the prior determinations because the interests of those defendants are identical to the interests of the other NFL member clubs, with whom they are in privity, and their interests were adequately represented in the prior actions. *See Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Aluminum Co. v. Admiral Merchants Motor Freight, Inc.*, 486 F.2d 717, 721 (7th Cir.),

*cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973).

**27.** Although the Los Angeles Raiders, Ltd. were not named as a defendant in the *USFL* case, the court finds that there was a sufficient identity of interest to bind the Raiders as being in privity with the NFL and the other member clubs. *See supra* n. 26.

The court further notes that the NFL defendants had a full and fair opportunity to be heard on those issues because the trial took forty-eight days and produced a transcript of over 7,000 pages. *USFL*, 842 F.2d at 1341.

purposes of plaintiffs' claims.[28]

Defendants nevertheless contend that the *USFL* verdict is not entitled to preclusive effect because they had no incentive to appeal those issue because of the nominal damages awarded by the jury.[29] To support that assertion, the NFL defendants rely on *Berner v. British Commonwealth Pac. Airlines, Ltd.*, 346 F.2d 532 (2d Cir. 1965), *cert. denied*, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). The court finds that defendants' reliance is misplaced because the Second Circuit decided *Berner* before the Supreme Court established the current standards for offensive collateral estoppel in *Parklane Hosiery*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Moreover, the *Berner* case has been effectively overruled by the Second Circuit's holding in *Pinkney v. Keane*, 920 F.2d 1090 (2d Cir.1990). In *Pinkney*, the Second Circuit specifically held that:

> While lack of incentive to litigate vigorously may render the collateral estoppel doctrine inoperative, lack of incentive to appeal does not have the same effect.... Where review is available but is not sought, estoppel applies.

*Id.* at 1096 (citations omitted). The court concludes that at the trial level the NFL defendants had every incentive to litigate those issues because plaintiffs sought over $1.7 billion dollars in treble damages.[30] The court further notes that defendants had an opportunity to appeal the jury verdict on those issues and chose not to do so. Thus, the court rejects their contention that collateral estoppel should be denied be-cause of the jury's award of nominal damages.

Defendants further contend that the *USFL* findings should not be given collateral estoppel effect because they conflict with two other antitrust cases in which the NFL defendants were parties. Defendants first contend that the Ninth Circuit's decision in *Los Angeles Memorial Coliseum Commission* is inconsistent with the *USFL* verdict because the Ninth Circuit expressed "substantial uncertainty as to whether there truly existed a relevant antitrust market for major league professional football." (Defendants' Brief in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 19). Although the Ninth Circuit noted that "precise market definition ... [was] difficult" given "the exceptional nature of the [football] industry", 726 F.2d at 1391, the Ninth Circuit observed that:

> The NFL itself narrowly defined the relevant market by emphasizing that NFL football is a unique product which can be produced only through the joint efforts of the 28 teams. Don Shula, coach of the Miami Dolphins, underscored this point when he stated that NFL football has a different set of fans than college football.

*Id.* at 1393. The court thus concludes that rather than conflicting with the *USFL* definition of a relevant market of major league professional football in the United States, the Ninth Circuit's decision supports that determination.

---

**28.** The court further notes that other courts have found, in similar antitrust actions against the NFL defendants, that professional football constitutes a relevant market. *See, e.g., Los Angeles Memorial Coliseum Comm'n*, 726 F.2d at 1393 ("NFL itself narrowly defined the relevant market by emphasizing that NFL football is a unique product"); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 988 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (relevant product market was "indisputably the business of professional football"); *Mid–South Grizzlies v. National Football League*, 550 F.Supp. 558, 571 & n. 3 (E.D.Pa.1982) (relevant market was major league professional football), *aff'd*, 720 F.2d 772 (3d Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984).

**29.** The jury awarded the USFL only one dollar in damages. *See* 842 F.2d at 1340.

**30.** The court further notes that the other cases on which defendants rely are distinguishable because they all involved situations in which defendants lacked sufficient incentive to vigorously litigate issues at the initial proceeding, either at trial or on a motion for summary judgment, rather than on appeal. In the *USFL* case, the court concludes that the NFL defendants had every incentive to vigorously litigate those issues at the trial level because the *USFL* plaintiffs sought treble damages in excess of 1.7 billion dollars. 842 F.2d at 1341.

Defendants also contend that *American Football League v. National Football League,* 205 F.Supp. 60 (D.Md.1962), *aff'd,* 323 F.2d 124 (4th Cir.1963) is inconsistent with the *USFL* case because the district court determined, 205 F.Supp. at 76–77, and the Fourth Circuit affirmed, 323 F.2d at 130–31, that the NFL defendants did not possess monopoly power in the relevant national market for major league professional football. 205 F.Supp. at 65; 323 F.2d at 129–30 (defining relevant market). Those decisions, however, were based on the existence of another, comparable professional football league, the American Football League.[31] The *American Football League* case was decided three years before the AFL and NFL announced their potential merger and seven years prior to the completion of that merger. Thus, the court concludes that the *American Football League* case is distinguishable because the composition, almost thirty years ago, of the fledgling National Football League was radically different than that of the 1985 NFL defendants when they participated in the *USFL* litigation.[32] Thus, the court rejects defendants' claim that the *American Football League* case conflicts with the later monopolization finding of the *USFL* jury.

Defendants further contend that the *USFL* verdict should not be given preclu-sive effect because the verdict, specifically the award of nominal damages, may reflect a jury compromise. However, both the district court and the Second Circuit specifically found that the *USFL* verdict was not the product of such a compromise.[33] The court thus rejects that argument.

▬▬▬ Defendants finally argue that collateral estoppel is inappropriate because the issues determined in *USFL* are "utterly irrelevant to this case." (Defendants' Brief at 22.) The court first concludes that the existence of the NFL defendants' monopoly power in an output market is relevant to plaintiffs' claims to the extent that such claims are to be judged under the rule of reason. *See, e.g., International Travel Arrangers v. Western Airlines, Inc.,* 623 F.2d 1255, 1267 (8th Cir.), *cert. denied,* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980) (such market power relevant to rule of reason analysis). Moreover, the existence of defendants' monopoly power is relevant for purposes of determining whether the challenged restraints are more anticompetitive because they have been imposed by a monopolist because under the Sherman Act, a monopolist is often precluded from engaging in a practice that would be lawful in the absence of monopoly power. *See, e.g., id.* at 1267 ("Davids can engage in many kinds of conduct in the marketplace that are forbidden to Goliaths") (quoting

---

**31.** In *American Football League,* the Fourth Circuit found that there were three areas in which the rival leagues competed on a national basis: for television coverage, for spectators and for outstanding players and coaches. 323 F.2d at 130. The Fourth Circuit's determination that there was nationwide competition for the services of professional football players thus foreshadowed and is entirely consistent with the relevant market holdings in *Kapp, Mackey* and *Smith.* The Second Circuit also noted in the *USFL* case that "in 1966, the NFL and the AFL agreed to merge, largely because the competition for players had sharply increased salaries. Congress exempted this merger from the antitrust laws by legislation...." 842 F.2d at 1344.

**32.** Plaintiffs also argue that the 1970 merger of the AFL and NFL was in large part responsible for the NFL defendants' ability to achieve monopoly power in the national market for major league professional football.

**33.** The district court held that:

Any inference of a compromise verdict in this case is easily rebutted by "an equally reasonable and perhaps even better explanation" namely that the jurors consciously and unanimously based their award on the Court's charge on nominal damages. Indeed, the USFL concedes the validity of such an explanation, while arguing that the charge the jury may have followed was "entirely erroneous." Given plaintiffs' concession, as well as this Court's independent finding that "the record itself viewed in its entirety [does not] clearly demonstrate the compromised character of the verdict," a new trial is not justified on the grounds of improper compromise.

*USFL,* 644 F.Supp. at 1050 (citations omitted).

In upholding that ruling, the Second Circuit stated:

We also reject the USFL's claim that the award of nominal damages in an antitrust case is somehow 'suspect.' Other courts routinely approve the award of such damages....

*USFL,* 842 F.2d at 1377 (citations omitted).

*Purex Corp. v. Procter & Gamble Co.,* 596 F.2d 881, 885 (9th Cir.1979)). The court thus concludes that the issue of whether defendants have monopoly power is relevant to the inquiry of whether the challenged restraints are anticompetitive under the rule of reason.

The court further notes that defendants' contentions ignore the arguments on which their "competitive balance" defense is predicated. Thus, although defendants argue that monopolization of an output product market, that is the market for major league professional football, is irrelevant to a determination of the legality of restraints in an input labor market, that is the market for professional football players' services, they nevertheless premise their entire rule of reason defense on the alleged necessity of implementing player restraints in the relevant input market in order to strengthen their ability to compete in the output market. For example, defendants contend:

> Player contracting rules, such as Plan B's right of first refusal/compensation system, are part of an interdependent system of complex rules that are ... critical for the production of an attractive and high quality entertainment product.

(Defendants' Submission Regarding the Expected Testimony of Certain Experts at 3 (Nov. 25, 1991)); (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment on Counts I & II at 21 (Dec. 9, 1991)) (Plan B is a proper "ancillary restraint [] ... designed to enhance the attractiveness of [the] product" of professional major league football). The court thus determines that the existence of monopoly power is relevant to plaintiffs' claims.

In summary, the court determines that the *USFL* jury verdict is entitled to collateral estoppel effect and that the NFL defendants are precluded from relitigating the existence of their monopoly power in the relevant market of major league professional football in the United States. *See* 644 F.Supp. at 1040.[34]

**C. The Existence of the NFL Defendants' Monopoly Power In the Relevant Market for Services of Major League Professional Football Players in the United States**

█ Plaintiffs finally argue that in light of the decisions in *Kapp, Mackey, Smith* and *USFL,* and because defendants have monopoly power in the market of major league professional football in the United States, a fortiori, they have monopoly power, actually monopsony power, in the relevant market of professional football players' services in the United States. Plaintiffs concede, however, that that issue has never been resolved by another court. Based on their admission that this issue has never been litigated, the court concludes that plaintiffs are not entitled to collateral estoppel on that issue and denies their motion for partial summary judgment on the NFL defendants' monopoly power in the relevant market of professional football players' services in the United States.

5. *Plaintiffs' Motion for Partial Summary Judgment on Count I of the Amended Complaint*

█ In Count I of their amended complaint, plaintiffs challenge the right of first refusal/compensation system, as currently embodied in Plan B. That system grants NFL member clubs various first refusal and compensation rights over their veterans players, even though their contractual rights to those players have expired. *See Powell I,* 678 F.Supp. at 779. Relying on *Mackey, Smith* and *Kapp,* plaintiffs argue that "there is now sufficient judicial experience to warrant application of the *per se* rule to find [the player reservation system challenged in Count I] unlawful." Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment at 1,

---

**34.** The court further notes that the finding of monopoly power in the *USFL* case was made despite the fact that a rival football league existed at that time. At the present time, there is no rival league and the NFL defendants occupy 100 percent of the relevant market. The court thus determines that the jury's determination that defendants' possessed monopoly power was based on a situation less compelling than that presented by the instant case.

15. The court notes, however, that none of the cases on which plaintiffs rely directly support their proposition. All three courts expressly declined to apply the per se rule. *See Mackey*, 543 F.2d at 619 ("the unique nature of the business of professional football renders it inappropriate to mechanically apply per se illegality rules"); *Smith*, 593 F.2d at 1182 ("the legality of player restrictions in professional sports should be governed by the rule of reason"); *Kapp*, 390 F.Supp. at 82 ("in this particular field of sports league activities the purposes of the antitrust laws can be just as well served (if not better served) by the basic antitrust reasonableness test as by the absolute *per se* test sometimes applied by the courts in other fields"). Thus, while there has been prior litigation concerning various player restraints by the NFL, all of the cases applied the rule of reason rather than the per se analysis.

The court further notes that Plan B, as it currently exists, has never been subject to antitrust scrutiny. *Smith* involved a challenge to the college draft as it existed before collective bargaining in 1968, and thus had nothing to do with any restraints concerning the movement of veteran players. *Mackey* and *Kapp* both analyzed the Rozelle Rule, which allowed the league's commissioner, at his discretion, to award players, draft choices or both as compensation to a club that had lost a veteran free agent player to another club. *See Mackey*, 543 F.2d at 609 n. 1. In the fifteen years since those decisions, however, that system has been amended three times, twice by collective bargaining agreements and once after a bargaining impasse.

The court further concludes that it is bound by the *Mackey* decision, in which the Eighth Circuit determined that the Rozelle Rule should be judged under the rule of reason rather than the per se rule. Accordingly, the court denies plaintiffs' motion for partial summary judgment concerning the application of the per se rule. *Cf. National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*,

468 U.S. at 101, 104 S.Ct. at 2960 (refusing to apply the per se rule in industry where horizontal restraints were necessary "if the product is to be available at all").[35]

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment on Count II of plaintiffs' amended complaint (proposed wage scale claim) is denied;

2. Defendants' motion for summary judgment on all of plaintiffs' claims, based on defendants' contentions that they are a single economic entity incapable of conspiring under § 1 of the Sherman Act and that the Sherman Act does not apply to restraints that operate solely within a labor market, is denied;

3. Defendants' motion for partial summary judgment to limit plaintiffs' antitrust damages to only those damages that occurred after this court's May 23, 1991, decision, is denied;

4. Plaintiffs' motion for partial summary judgment asking the court to apply the per se rule to Count I of the amended complaint is denied;

5. Plaintiffs' motion for partial summary judgment on Count II of their amended complaint (proposed wage scale claim) is denied; and

6. Plaintiffs' motion for partial summary judgment on the definition of relevant markets and whether defendants possessed monopoly power in those markets is granted in part and denied in part.

---

**35.** Based on the courts' determination that the challenged restraints should be judged under the rule of reason, the court did not address the NFL defendants' argument that the per se rule should not be applied because those restraints are ancillary to their "joint venture".